In the Matter of the Estate of GEORGE M. STUMPP, Deceased.

Surrogate's Court, New York County, September 7, 1934.

*Brown, Brenton & Watts,* for the executors.

*Wayland & Bernard [Robert W. Bernard* and *Thomas G. Prioleau* of counsel], for Rose Stumpp, widow.

*Winfield DeWitt,* for Lena Stumpp, general guardian of Gloria Stumpp and another, infants.

*Frederick W. Sperling,* special guardian of Robert Mehl, infant.

*Davies, Auerbach & Cornell [Nicholas F. Lenssen, Sydney G. Soons* and *Dermod Ives* of counsel], for Beatrice Mehl, legatee.

*Sawyer Thompson* [*L. Oscar Thieme* as their attorney-in-fact], for Michael Stumpp and others, legatees.

*Thomas F. Frawley*, for Alfred Hofmann, as assignee of legacy bequeathed to Rose Stumpp.

DELEHANTY, S. This intermediate executors' account reports on hand assets concededly insufficient to pay in full the legacies given by the will. Decision must be made whether any and, if any, which legacies are entitled to preference; and whether various objections to the account are valid. These objections put in issue the conduct of the executors in relation to the securities received by them and seek to charge them with the loss due to non-liquidation of such securities. The inventoried value of the securities in question exceeded $200,000 and the criticised shrinkage in value is in excess of an amount sufficient to pay the general legacies in full.

Decedent died October 24, 1930. His will was admitted to probate November 24, 1930, and letters testamentary were issued on November 25, 1930, to a son and daughter of deceased and to an executive of a bank in which deceased carried his account. The son and daughter are sole residuary legatees. Their children are general legatees. Questions of priority are raised respecting the legacy to the widow of deceased and the legacies to the grandchildren of deceased. Concededly there is no value now in the residuary legacy. Concededly all of the criticised acts or defaults of the executors in failing to liquidate the securities were performed with the knowledge and approval and co-operation of all three executors. The question involved is whether there shall be a surcharge of the executors in a sum sufficient, with the assets on hand, to pay the remaining expenses of administration and the balance due on all general legacies. The funeral expenses and the debts have been paid.

As of the date of death, the estate was appraised at a gross sum of $461,465.36. The general legacies total $144,000. The funeral expenses were $3,787.67 and the debts $114,860.24. The administration expenses and taxes so far scheduled amount to $13,319.06. The large difference remaining shows that there was a very substantial residuary estate on the basis of the values existing at the time of deceased's death.

At his death deceased owed to the bank whose official is named executor a substantial amount of money on a note secured by collateral. In the late winter and early spring of 1931 the commercial department of the bank in question insisted upon payment of that loan and in consequence securities of the estate were sold in an amount sufficient to pay it as well as to provide for other

needs. These securities were liquidated at values averaging about fifteen per cent below those existent on the day of death of deceased. It is undisputed that as of that period the remaining securities in the estate could have been liquidated at values which would show gains in part and losses in part and would have assured full payment of the general legacies and have left a substantial residuary.

Deceased in his lifetime accumulated his fortune in the florist business and after having retired from it still continued to be interested, though not financially, in the conduct of the business by his successor, his son. Under the son's management the business did not prosper and the record indicates that about June in each year deceased, in support of the good name of the business which he had built up, loaned to his son sufficient money to pay the debts of the business and to furnish capital for the fall business, taking a note for the amount advanced. The record indicates that about holiday time in each year deceased canceled the note taken in the preceding summer and thereby made a gift of the loan to his son. Deceased had a home in Germany to which he went every summer time. He died there in October, 1930. The advance made to his son in June of that year was $30,000 and when deceased died a note in that amount signed by the executor-son constituted part of the assets of the estate. Apparently the son was in difficulties or apprehended that he would soon be in difficulties in January, 1931, and the executors then took what purported to be an assignment of the son's interest as residuary legatee to secure the estate for the payment by the son of this $30,000 obligation. They took no other steps to collect it. By reason of the shrinkage in the securities of the estate the son's interest in the assets has disappeared and the executors concede that the claim on the note is uncollectible at this time. The instrument of assignment extended for a period of thirty days the obligation of the executor-son to pay his note. At the end of that period nothing more was done. It is now suggested that the assignment was not what it purported to be (a genuine procedure for securing payment to the estate of the amount due it) but was a method of covering up the son-executor's property to avoid seizure by his other creditors. The executors appear to have gone through this procedure on the assumption that it had some legal effect though the son's debt to the estate was a charge against his interest irrespective the assignment. (*Smith* v. *Kearney*, 2 Barb. Ch. 533.) Wholly apart from the legal effect of the taking of the assignment the incident has value in exhibiting the motives which actuated the executors generally in the handling of their trust.

The executors caused to be published a notice to creditors to present claims. The time for such presentation expired in June, 1931.

The will contains a specific devise to deceased's widow of deceased's home in Germany and a specific legacy to her of the personal property therein. There was controversy with the German taxing authorities respecting the place of residence of deceased and that government indicated an intention to assert a right to tax the entire property of deceased for death duties irrespective its location. Concededly no other property was within the territorial jurisdiction of the German government except the real estate and the personalty specifically devised and bequeathed respectively to deceased's widow. No real contention is advanced by the executors that the property in their hands in this country could have been seized for any such tax no matter what finding of residence the German government might have made. There is some proof by an expert in German law that any beneficiary of the estate might (if actually found within German boundaries) be subject to an action by the taxing authorities of that government to collect any tax imposed upon the general estate on a finding of German residence or German citizenship of deceased and that such beneficiary would be compellable to respond in such action up to the amount actually received by the beneficiary from the estate whether out of property in Germany or elsewhere. Apparently considerable time was taken to determine the German tax. It eventually was adjusted at about $1,100, with added cost of counsel fees of about $1,200.

Deceased was himself an executor of an estate and his executors had accounted therein. The final decree settling their account in his behalf was entered in May, 1931. The executors assert that they feared the possibility of surcharge in such accounting because securities in the estate so accounted for showed a loss.

The executors urge this possibility of surcharge, the need to await the date fixed in the notice requiring presentment of claims by creditors and the German tax situation as the only items which in the slightest degree delayed settlement of the estate. Counsel now argues that because the shrinkage in estate securities had transpired before the three causes for delay had been removed no responsibility attaches to them for loss on the securities. They invoke the rule in *Matter of Clark* (257 N. Y. 132). They presented to the court proof of the making by them of certain inquiries, the receipt by them of certain information and the consultation by them of certain statistical data relating to the retained securities. They assert reliance upon the information and advice received by them from acceptable sources and assert that they acted in good faith

and with the motive to realize upon the assets of the estate the maximum possible.

Aside from some mortgages, the securities in this estate were exclusively speculative in character. Except for a block of 524 preferred shares of a railway company and 25 preferred shares of an industrial company they consisted entirely of common stocks. When in the late winter and the early spring of 1931, the executors sold some of the stocks to enable payment of the bank loan they realized in some cases slightly more than the appraised value at the time of death. At least as late as March, 1931, the shares could have been sold at close to the inventoried price. The executors had a full four months from the date of their letters in which to dispose of these speculative securities before a major loss occurred. The tax problem which was offered as a reason for delay and the potential or actual claims of creditors had no relation to the duty of the executors to dispose of these speculative securities. The proof affirmatively shows that the executors realized that the stocks were speculative. Gloss attempted to be put upon their conduct by proof of the views of economists and businessmen respecting the possibility of a rise in stocks from the level of early 1931 does not conceal the fact admitted by one of the executors that they were holding on to the securities solely in the hope that stocks would go up.

At the hearing emphasis was put on the fact that certain shares held by the estate were preferred shares. One small block of such shares was sold at or about the appraised value. It is not consonant with the record to consider the 524 preferred shares of a railway company still held as other than speculative stock. These shares were appraised as of date of death at sixty-five and one-half. They were selling in the month after the executors qualified as low as fifty-one, a shrinkage of over twenty per cent. They reached a high level of sixty-four and one-half in the same month and went up to sixty-nine and three-eighths in January. The executors witnessed a fluctuation from the low point stated to this high point in January and let pass the opportunity to sell.

In respect of the common stocks the history is quite the same. Another railroad stock was appraised at 140. In December it shrunk to $105\frac{1}{8}$, a loss of twenty-five per cent in value. It reached 132 in December. It shrunk to 113 in January and went back to 132 in February. Despite these wide fluctuations the executors did not sell. Another railroad stock was appraised at 60. It reached a low point of 42 in December, went back to 55, shrunk again in January to 47, went back to slightly above the appraised value, fluctuated further in February but attained at times the

appraised value and still the executors did nothing about it. An industrial stock which constituted the largest single investment was appraised at $150\frac{7}{8}$. It went as low as $134\frac{3}{8}$ in December and fluctuated between that point and $147\frac{1}{2}$ during that month. It had a slightly lesser variance in January. In February it reached a point above the appraised value. In March it substantially equalled the appraised value and the executors did nothing about it.

They offer excerpts from views of economists. Study of their material shows that the data which they furnish establishes that market conditions in early 1931 were recognized as highly speculative. The views expressed all dealt with probable further losses and whenever anything of hope was held out for the future it was qualified by the reference to long term investment and, as one prophet said, " patient holding through still lower levels." Even the optimistic forecasts were based upon the " long pull " and other hopes of eventual but distant market recovery phrased in the familiar argot of Wall Street. Nothing in the material presented warranted any belief other than that danger to the estate existed so long as these speculative shares were held. The hopes which an adult might indulge and the speculative hazard he might take in respect of his own property were not admissible as a rule of conduct for these executors.

The testimony of the executor-son makes it clear that he and his sister as residuary legatees were seeking to recoup the shrinkage in value of shares purchased at higher prices by their father; and that they were seeking to do this solely for their own benefit and (after the value in the residuary had disappeared) solely at the expense of the legatees. Happy would be the speculator who could use other people's money for his margin, who could take all the profits if the speculation won, and who could load any loss of capital on the helpless furnisher of the money for the speculation.

The court holds that *Matter of Clark (supra)* is not here applicable. It finds as a fact that the motive underlying the action of the executors was the attempted recovery of values which had disappeared before decedent's death. The trust which these executors took upon themselves was to administer the property which they received. That property had only the inventoried value. While the executors might have believed reasonably that their father expected that his estate would pay them more than the value of the residuary as ascertained by the inventory it was that value only which they had to administer. Nor are the cases applicable which involved the liquidation of large blocks of shares or shares in close corporations. (*Matter of Andrews*, 239 App. Div. 32.) Here the shares were dealt in regularly on the New York Stock

Exchange. Some of the shares held were among the most speculative and most active issues on the exchange. Caution would have dictated an order to sell these shares immediately upon qualification. Nothing whatever has been shown (except this wholly improper motive to benefit the executors as residuary legatees) why there was any delay in the sale. If the executors wanted to speculate they should have speculated with that portion of the property of deceased which under his will they were entitled to have, to wit, the net value of the estate if they had promptly reduced it to cash, had paid the known debts and reserved a reasonable sum for other possible claims and administration expenses. Their course of conduct compelled the legatees to speculate with them in railway and industrial stocks with the advantage if any to be realized by these fiduciaries alone in their capacity as residuary legatees.

The executors assert a discretion to hold the securities by reason of the text of clause fourteenth of the will relating to power to sell. The court holds that this clause was intended to remove any doubt of the power of the executors to sell and that it did not vest authority in the executors to speculate with the estate assets nor change their obligation to sell speculative securities promptly.

The executors assert that the estate could not have been settled even though the securities had been reduced to cash and hence that they should not be surcharged with losses during the period prior to the date when distribution was possible. They were not justified in holding speculative securities merely because they could not make distribution of the cash realized thereon. The controversy over the German tax claim has been magnified out of all proportion to its intrinsic importance. The assertion of uncertainty as to possible surcharge by reason of deceased's acts as executor in another estate and of the fact that the period of publication for claims had not expired are beside the mark. This deceased had long before his death retired from active business and, as the account shows, had no debts other than his debt to the bank. There is no suggestion that the executors really thought he had any other debts, but whether they thought so or not their duty to liquidate speculative common stocks was an urgent immediate duty. When that duty had been performed they could have invested in legal securities if they chose or have held the money at interest. If their present theory of action is accepted then an indefinite delay by reason of the non-ascertainment of the last possible claim against an estate would be complete excuse for losses during that interval.

The executors assert that the beneficiaries acquiesced in their withholding of securities. The burden of establishing that defense

is on the executors. They wholly failed to do so. All that was offered was some talk between the son-executor and the widow of deceased respecting the organization of a corporation which would take over the estate assets and in which the respective legatees would have interests proportionate to their legacies. These discussions necessarily contemplated a value in the residuary legacies. They never reached any result and even the executors' witnesses failed to establish anything said or done by the widow which altered in the slightest respect their duty to liquidate. The widow denied any agreement. As to one of the children of deceased's daughter (a legatee) there was a showing made that at times she was present with her mother at the bank where conferences among the executors were held and that she discussed the estate affairs with her mother at home. The court holds this is entirely insufficient to estop her from making objections.

The executors assert that the widow of deceased kept her own securities which consisted of common stocks and which, as stated, had been pledged to secure her debt to the bank; and that she did not sell them during the period when these losses accrued to the estate. The executors' counsel do not offer her attitude about her own securities as a rule of conduct but say that the court should take her conduct into account as an element in considering the propriety of the decision reached by the executors to hold the estate securities. What an adult might do with his own securities is of course no test of the duty of fiduciaries. They urge also that the failure of the respective beneficiaries to object should likewise be taken into account. The difficulty with the latter argument is that the losses transpired before any of the beneficiaries had any right to inquire as to what was being done by the executors. The executors did not consult with the beneficiaries about whether to sell or not to sell and there is no basis in this record for holding that the silence of the beneficiaries advantages the executors in any aspect. After the loss in value had occurred and after the objections by the beneficiaries had been made there was delay in the hearing which counsel for the executors again asserts as basis for acquiescence by the beneficiaries. The latter cannot be prejudiced in their legal positions by that delay. There was no showing that the executors in any wise modified their position in reliance upon any action of the beneficiaries. The legal issues had been established by the objections and the beneficiaries are entitled to decision on such issues irrespective the delay in hearing them.

Point is made that one or more of the adult legatees failed to file objections to the account. The executors correctly state that the surcharge must be limited to the amount necessary to make

good those who did object. (*Matter of De Vany*, 205 N. Y. 591; *Matter of Roche*, 259 id. 458; *Matter of Garvin*, 256 id. 518.)

The executors in their brief make the point that the two who were residuary legatees were entitled to protect their residuary interest. No one disputes this. Of necessity they could protect their residuary legacies only by protecting those legacies which had priority in payment. What they sought to do in fact was to increase their residuary legacies over the values which they had at the time of death. They sought to accomplish that increase by holding speculative securities in the hope and the expectation (no doubt honestly entertained) that these speculative securities would increase in value. They knew that if these securities were sold so as to pay the prior legacies the hope for increase in value of the residuary legacies to themselves would be limited to an increase on a very much smaller body of speculative stock. For that reason they held the whole body of speculative stock. In effect they used other people's money as margin on a speculative account for their benefit. They were fiduciaries as well as legatees. Where their personal interests clashed with their trust obligations they should have performed their fiduciary duty. Had they done so, the value which their father's gift to them had as of their father's death would have been realized by them.

The executors argue that none but George E. M. Stumpp, the son-executor, is chargeable with failure to collect his indebtedness of $30,000 to the estate and cite *Adair* v. *Brimmer* (74 N. Y. 539) and *Nanz* v. *Oakley* (120 id. 84). The question here is not one of outright collection out of the private assets of George E. M. Stumpp but rather one of so handling the estate that the assurance of collection which existed when letters were issued and for months thereafter would be preserved and such liquidation of the estate had as would assure that the residuary interest of the son-executor at least equaled (when realized upon) the amount of his indebtedness. It was here that the executors and all of them failed in their duty.

While the conclusion reached requires surcharge of the executors in an amount sufficient to pay all legatees in full there is no assurance that the executors are able to respond to the surcharge. It is necessary in such circumstances to consider the relative rights of the legatees. Determination of the preference if any among the legacies requires consideration of the background against which the will was drawn. It is dated November 18, 1929, and antedates, therefore, the new legislation securing to surviving spouses the right of election against a will. At the time it was executed deceased had long been out of active business. He was living during the winter season at an apartment on Park avenue in New York city and

during the summer season at his summer home in Germany. His son was married and was living with his family in a separate household. His daughter with her family were living separately also. The son was conducting the florist business. While he did so unsuccessfully he was apparently paying his living costs out of that business — the deficit due thereto and to business losses being made up as heretofore stated by loans made by deceased to his son and afterward canceled. Deceased's daughter was in receipt of a monthly allowance from him which beginning with the month of May preceding the death of deceased amounted to $300 per month. The grandchildren of deceased lived with their respective parents. For some twelve years deceased's household was comprised of himself and his second wife and their employees only.

In preparing his will, deceased first directed payment of his debts and funeral expenses. In his next paragraph he made his gifts to his wife. First he gave her the real estate in Germany and all the personalty used in connection therewith. Next he gave her the contents (with certain exceptions) of their home in the United States. Then he bequeathed to her $80,000. Then he stated that all the devises and bequests recited were to be in lieu of dower and of any interest she might have in his estate. Next he made small gifts to four cousins. Next he made gifts of $20,000 each to the children of his daughter. Next he made gifts of $10,000 each to the children of his son. Next he made specific gifts of jewelry to his daughter and to his son and then gave all the rest and remainder of his property to them " subject to the satisfaction and effect and operation " of the earlier gifts. He then nominated his son, his daughter and the bank official as his executors. He then gave to them as executors power to sell any of his property and power to settle and compromise claims either in favor of or against his estate. He then charged the residuary with all death taxes, whether estate or transfer taxes.

The widow of deceased had no private resources except such as had come from deceased. He had made her various gifts. In her name apparently, there had been carried on some stock transactions in which profits had been made prior to the stock market collapse. At the time of his death the wife owed the bank where deceased carried his account a substantial sum of money on her note secured by collateral. This transaction represented a stock purchase which deceased advised his wife to make. There was a substantial equity in the account at the time deceased died but it is plain from the testimony that that account was not regarded by deceased as furnishing any substantial resources to his wife. Deceased lived in the style of a man of substantial wealth. As

stated, he maintained two households. By his gifts he evidently expected that his wife, at least temporarily, would continue both households. In the circumstances he knew that her resources, outside the money legacy which he gave her by his will, would be wholly insufficient for the maintenance of these households. As said in *Matter of Neil* (238 N. Y. 138, 140): "It is the testator's mind we seek to read." Interpreting this mind of his and considering his family and personal background and the order in which he made the gifts in his will and the combination of money gift with gift of house and household equipment the court must needs conclude that the testator considered the money gift as necessary for the support and maintenance of his wife in the households which he had given to her and that he intended to prefer her over all others. This view is supported by the authorities. (*Matter of Neil, supra; Matter of Title Guarantee & Trust Co.*, 195 N. Y. 339; *Matter of Smallman*, 138 Misc. 889, 909.)

Counsel for the surviving widow assert a further basis for preference, to wit, that she is a legatee by purchase. They cite the provision in the will that the legacy is in lieu of dower, but it is conceded that there was no real property to which any dower right of the widow attached. They suggest also that the widow has waived her specific exemption under section 200 of the Surrogate's Court Act. There is contest whether she has not received the benefit of that exemption, but whether she had or not would be immaterial. By statute the amount of it is no part of the estate. Neither waiver nor acceptance of the specific exemption could affect her status as purchaser. The court is of the view that she is not entitled to preference on that basis.

Claim of preference is also made in respect of the gifts to the grandchildren. The argument in support of this claim for preference attacks the widow's contention that she is a preferred legatee only in the aspect of claim of preference by purchase. The attack upon her status in that aspect is held to be sound. However, every argument made in support of the claim of preference for the grandchildren operates more strongly in favor of the widow's right of preference on the basis which the court has held to be sound. The making of the argument in behalf of the grandchildren is a recognition of the principle of preference for the reasons held valid by the court in favor of the widow. The maximum that could be said in favor of the grandchildren is that their legacies are on a parity with that of the widow, but the court is not able to find in this record a basis upon which such parity may be granted. As heretofore stated, these grandchildren are the children respectively of the residuary legatees. None of them was directly supported by

deceased. Deceased no doubt knew that their parents respectively maintained the grandchildren in the one case out of the proceeds of the business and in the other case out of the allowance made to deceased's daughter. Deceased intended probably that the son and daughter should be large beneficiaries under his will. They would have been substantial beneficiaries had they conducted their trust properly. The primary obligation for the support of the grandchildren was on their respective parents. The record shows that they discharged that responsibility and that deceased at no point assumed it, though he paid for the schooling of a son of his daughter. The court holds that the grandchildren are not entitled to a preference but are unpreferred general legatees.

The matter of interest on the legacies requires determination. Nothing in the will warrants the conclusion that the legacies were in any instance to bear interest from date of death. Since deceased died prior to the amendments effected by chapter 562 of the Laws of 1931 interest accrued beginning one year after the date of letters testamentary. (*Matter of Donahue*, 149 Misc. 558.)

Justice to the objecting legatees requires surcharge of all three executors in an amount sufficing to pay them in full. The actual amount of the surcharge is not presently ascertainable since this is an intermediate account and since the chief assets which the executors now have on hand are not readily salable. The rights of the legatees, however, may now be fixed and the principle of liability of the executors established. In a subsequent proceeding their exact money liability may be fixed.

The decree will deny credit to the executors for advances made to one of the executors ostensibly on account of her residuary legacy. In the circumstances such advances were wholly improper and should not prejudice the right of any legatee whose interests were superior to hers.

The assignee of the preferred legacy to the widow of deceased has satisfactorily established his right to receive payment of such legacy up to an amount sufficient to satisfy her debt to him. While it is unlikely that the question will be other than academic the payments made to her by the executors prior to notice of his assignment as well as those made to her by the consent of the assignee after such notice will be credited to the executors in adjusting their payments to the assignee; but, so far as the assignee is concerned, they will not receive credit for advances made to the widow without consent of her assignee after notice of the assignment.

Commissions will be denied to the executors. This ruling is deemed necessary despite the fact that the strictures here made on the conduct of the executors are applicable chiefly to the legatee-

executors. The court is satisfied of the personal probity and good intentions of the third executor but cannot overlook the fact that the losses occurring in this estate are justly chargeable to him because of his failure to perform his duty.

The courts have recognized and will continue to recognize the unusual burden cast upon fiduciaries by the unprecedented shrinkage in values beginning in the fall of 1929. Similar recognition was accorded by the courts to conditions which followed prior industrial depressions. The current depression, however, has not given an immunity bath to unfaithful fiduciaries. Nothing in *Matter of Clark* (*supra*) warrants any fiduciary to ask as of course that losses in his trust shall be excused because of the depression. Fiduciaries who have honestly struggled with a difficult situation without seeking personal gain at the expense of their trusts will be given the benefit of that consideration which should be extended to good faith, honest effort and a fair performance of fiduciary duty. The fundamentals of fiduciary duty remain unchanged and misuse and deliberate mishandling of fiduciary property for selfish ends must be condemned by the courts. Speculation still is forbidden to fiduciaries. Prompt liquidation of speculative assets is still the standard rule. (*King* v. *Talbot*, 40 N. Y. 76; *Matter of Hirsch*, 116 App. Div. 367; affd., 188 N. Y. 584; *Villard* v. *Villard*, 219 id. 482; *Mertz* v. *Guaranty Trust Co.*, 247 id. 137, 143; *Matter of Hamersley*, FOLEY, S., 180 N. Y. Supp. 887, not officially reported; *Matter of Yung*, 103 Misc. 358; *Matter of Wotton*, 59 App. Div. 584; affd., 167 N. Y. 629.)

Submit on notice decree settling the account of the executors in conformity herewith.