In the Matter of the Judicial Settlement of the Account of FREDERICK WM. KOBBE, as Surviving Executor, and MARY CHICKERING NICHOLS, as Executrix, of GEORGE L. NICHOLS, Deceased, Executor of JANE E. ANDREWS, Deceased, Respondents. JANE E. DECKER and Others, Appellants.

Second Department, June 16, 1933.

*William O. Robertson* [*Kenneth C. Quencer* with him on the brief], for the appellants.

*William Dean Embree* [*Mizell Wilson* with him on the brief], for the respondents.

CARSWELL, J. Did these executors fail to liquidate this estate within a reasonable time after letters issued to them? If so, they were negligent and may be surcharged; otherwise not. General legatees who claim to have suffered a decrease in the amount of their legacies raise the question. The residuary legatee, which received nothing, does not complain.

The essential facts are undisputed Decedent died November 16, 1930. Her will was executed June 19, 1928. She named G. L. Nichols and F. W. Kobbé as her executors. Letters issued to them on January 5, 1931. She left an estate of about $1,500,000, in what appeared to be sound securities. She executed a codicil on January 30, 1929, increasing some legacies as a consequence of a then appreciation in values. The will, after making certain specific bequests, provided for more than fifty general legacies, aggregating about $650,000. In a separate paragraph the sum of $400,000 was allocated among a limited group of general legatees. The residuary estate was bequeathed to St. Luke's Hospital as a memorial for decedent's husband. The codicil bequeathed a further sum of $100,000, distributed among a still more limited number of general legatees.

The general legacies, which amounted to $650,000, were paid in cash Of the $400,000 of general legacies in the limited group mentioned, $237,000 were paid by distribution in kind of shares of Continental Insurance Company. Nothing was paid on account of the $100,000 group of legatees covered by the codicil, and nothing remains for the residuary legatee.

When decedent died (November 16, 1930) the market values of her securities would have enabled the residuary legatee to get in excess of $200,000. In August, 1931, the decreased market values showed a residuary estate of about $50,000; the value of the residuary estate between the date of decedent's death and August, 1931, ranged from $240,000 to $100,000. In October there was a small potential residuary estate, and by November it had vanished, that being the time when the securities still on hand were liquidated by the executors.

The executors advertised for claims against the estate. The period for presentation expired August 6, 1931. At this time the first group of general legatees had received on account about fifty per cent.

The executors were men of high standing and great experience. They were familiar with the decedent's securities and those of her husband, who had predeceased her. In administering the estate they took counsel of three men of great repute in financial matters, who were connected with the residuary legatee.

The greatest problem was a block of 17,000 shares of Continental Insurance Company stock. It was then regarded as a high grade conservative investment, as were all the other securities.

When decedent died, there had been a drop in the market value of securities occurring over an eight-month period. The concensus of opinion of those from whom counsel was sought was that the securities even at the date of decedent's death were below their intrinsic worth. In this situation the executors, like many others, expected a better market before the expiration of 1931 than that which prevailed in the early part of that year. The size of the Continental Insurance Company block made it difficult to liquidate. It was appraised at $45 a share, although that was deemed below its inherent worth by every one. The executors had seen this stock sell from between 70 and 80 in 1930, to as high as 110 in 1929. The minimum value placed on it by an informed adviser was $48\frac{1}{2}$. No group or syndicate was available to take the entire block. A plan was evolved to liquidate one-third of it at 50, and that amount was worked off in lots of 200 to 500 shares to prevent a break in market value. Thirty-five hundred shares were sold at 50 during February and March, 1931. The price went down to 48. After further conferring with a specialist in this stock, the executors decided to try to sell 2,000 shares at $48\frac{1}{2}$. After 800 shares had been sold, the market fell off sharply, and the rest of the block was not sold. This was in April, 1931. At that time the almost universal opinion was that the market value on all of the securities in the estate was below intrinsic worth. How-

ever, in the fall of 1931 the market, instead of getting better, as was expected, got worse. When Great Britain went off the gold standard, conditions generally became more panicky and unstable. A slight improvement in values occurred in the early fall of 1931. The executors proposed to the legatees that a corporation be formed to hold the unsold assets of the estate until business and prices returned to what was deemed to be normal. This suggestion was rejected.

In November, 1931, the executors, in view of the approach of the end of a year from the date of their appointment and in view of the future conditions then continuing to have a depressing appearance, concluded they should liquidate, as they were unable to get satisfying counsel or light to follow a different course. They accordingly sold out all of the securities with the exception of the Continental Insurance Company stock they had on hand, which they distributed in kind to the legatees.

The objectants, appellants, say that it was the duty of the executors to liquidate sufficient of the securities to pay off the general legatees, and their failure to do so in time to enable the general legatees to get one hundred per cent was negligent conduct, under the facts recounted, for which the executors should be surcharged. They argue that the executors owed a different degree of duty to the general legatees from that which they owed to the residuary legatee. They say that the course pursued by the executors was speculating with the funds of the estate (primarily dedicated as among legatees to general legatees) at their expense and for the benefit of the residuary legatee. They cite no case to sustain the claimed doctrine that there is a different duty owing to a general legatee from that owing to a residuary legatee. Extensive research discloses no declaration of doctrine that any different degree of duty is owing by executors to a general legatee from that which is owing by them to a residuary legatee. In the absence of such a declaration, which would delimit the measure of duty owing by an executor to a residuary legatee as compared to that owing to a general legatee, we must assume that the same measure of duty is owing from an executor to both classes of legatees. The true rule (which is somewhat flexible) on the duty owing by executors when they are confronted with a situation such as developed herein is to dispose of and liquidate the estate left by their testator within a reasonable time. What constitutes a reasonable time will vary according to the circumstances and according to what would be deemed to be diligent and prudent conduct of reasonable men in the administration of their own affairs with reference to the same or a similar subject-matter. If,

in order to pay off the general legatees in full, there were an inflexible duty to sell the assets of an estate forthwith, without regard to what happened to creditors or the residuary legatee, it might well be that the foregoing rule of prudent conduct of action within a reasonable time would be violated if the question were precipitated by a residuary legatee because of a claim of premature action. In a given situation it might well be held to be imprudent to sell where the result ensuing was that of the general legatees getting their money in full and the residuary legatee getting nothing. An executor might be held to the view that a reasonably prudent person would have waited for a comparatively short time in order to avoid the consequences of what appeared to be a temporary condition, and thus be enabled to pay both classes in full — viewing the matter prospectively as of the day of action by the executors. In other words, precipitate liquidation might give rise to the same form of objection from the residuary legatee as that now lodged by these general legatees who claim that liquidation was unduly delayed. More especially might this be so if executors were called upon to liquidate a large block of a single stock when no market was available, because of the size of the block, which could adequately absorb it at its intrinsic worth, and, therefore, a slow distribution was unavoidable if conduct were to be prudent.

The true rule of action by executors, within the general doctrine indicated, requires them to act as nearly as may be at a time that would constitute a mean point between the seemingly precipitate date urged by objecting general legatees such as these, and the seemingly delayed date which would appeal to a residuary legatee when the situation is viewed prospectively.

It has been stated generally that an executor should liquidate and distribute the estate as soon as is consistent with the rights of creditors and his own safety. He furthers his own safety from claims being lodged against him by general or residuary legatees by being neither too precipitate nor too dilatory in his liquidation.

Two guides to a just decision herein are available to us: certain cases (*e. g., Matter of Weston,* 91 N. Y. 502) and certain statutes (Surr. Ct. Act, §§ 218, 253, 257-a). The *Weston* case is not greatly dissimilar to the instant case, and has its genesis in the 1873 panic.

We must view the executors' acts by a standard long relied on, that is, we must " look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place." (PECKHAM, J., in *Purdy* v. *Lynch,* 145 N. Y. 462, 475.) The situation is to be adjudged not in retrospect but in

prospect. Even the witless fool may pose as a paragon of wisdom after the unforeseeable disaster has occurred.

At common law, executors had one year in which to settle and distribute an estate. The matter was then regulated in the several States by statute. (*Burtis* v. *Dodge*, 1 Barb. Ch. 77; *Miller* v. *Philip*, 5 Paige Ch. 573; *Lawrence* v. *Embree*, 3 Bradf. Surr. 364.) In this State, formerly, the statutes did not make an accounting compulsory until eighteen months had expired. This period has been decreased from time to time. In *Matter of Brooklyn Trust Co.* (179 App. Div. 262) it was held that payment of legacies could not be enforced, under the statutory provisions then obtaining, until one year after issuance of letters. The same rule obtained in *Macy* v. *Mercantile Trust Co.* (68 N. J. Eq. 235) where a residuary legatee sought to enforce earlier payment.

Section 253 provides for a compulsory intermediate accounting at any time. Section 257-a provides for a compulsory accounting on a surrogate's own motion fifteen months after letters have issued, if an executor has omitted to account.

Section 218 of the Surrogate's Court Act, in effect April 21, 1931, provides that " No legacy shall be paid by an executor \* \* \* before the completion of the publication of notice to creditors if such notice be published, or if none be published before the expiration of seven months from the time from granting letters testamentary \* \* \* unless directed by the will or by a decree on an accounting to be sooner paid."

The foregoing has decreased considerably the period of time that a legatee must wait before he may enforce payment of his legacy. In the case at bar fifty per cent of the legacies were paid in August, when the period expired for presentation of debt claims pursuant to publication. There were importunities for further payments, which took on greater vigor early in the fall of 1931. But it may not fairly be said that the executors were negligent in awaiting the expected higher market in the fall. That the expected advance from a seemingly abnormal low level did not take place, but on the contrary a decline occurred, was a factor that the executors were not required to anticipate in the light of the expert advice upon which they were acting.

Section 218, however, does indicate a partial answer to these objectors' claims. They were free, at the end of seven months from the issuance of letters to the executors, to precipitate the question before the surrogate as to when the executors should be required to act. They seem not to have done so. They could have put their dissatisfaction with the executors' then seemingly sound policy of not selling securities on hand, in an appropriate

form or proceeding. Of course, that remedy was not exclusive. But, not having invoked it, they should not under the circumstances be heard to complain of the executors' action when they finally acted well within the generally accepted one-year period of liquidation and distribution of an estate, guided by seemingly informed counsel. The seven-month period just referred to is the minimum period when action ordinarily may be exacted of an executor in a particular case; but even that seven-month period may not be enforced in an appropriate proceeding if there is disclosed an inability to make the payments or the unwisdom of liquidating securities to make the payments of legacies at that time.

Therefore, viewed from the guides to be found both in the cases and in the statutes, there is no basis for a holding that these executors were negligent in the course which they pursued.

The decree of the Surrogate's Court of Suffolk county should be affirmed, with costs, payable by the appellants personally.

Present — LAZANSKY, P. J., YOUNG, HAGARTY, CARSWELL and DAVIS, JJ.

Decree of the Surrogate's Court of Suffolk county unanimously affirmed, with costs, payable by appellants personally.