In the Matter of the Estate of THOMAS F. BALFE, Deceased.
In the Matter of the Estate of MARY A. BALFE, Deceased.

Surrogate's Court, Orange County, September 13, 1934.

*Powell & Ruch* [*Clinton J. Ruch* and *Charles M. McCarty* of counsel], for the objectors.

*Milbank, Tweed, Hope & Webb* [*Russell Wiggins, Timothy M. Pfeiffer* and *Mizell Wilson* of counsel], for the trustee.

*Charles W. U. Sneed*, special guardian.

TAYLOR, S. . Mary A. Balfe died December 24, 1913, leaving a last will and testament by which she appointed her husband, Thomas F. Balfe, executor and trustee, with broad discretionary powers with respect to investments, and in the event of the death, resignation or other incapacity of her husband to act as such executor and trustee, she appointed "in his place and stead" the accountant here, the Title Guarantee and Trust Company. The paragraphs of the will appointing the executor and trustee and describing his or its powers are as follows: " I hereby nominate, constitute and appoint my said husband, Thomas F. Balfe, Executor of and Trustee under this my Last Will and Testament, hereby giving and granting unto him full power and authority, in his discretion, to sell and convey at either public or private sale any and all real estate of which I may die seized, and to make, execute and deliver good and sufficient deeds or other instruments in writing therefor.

" And I do further hereby expressly authorize and empower him as such Executor and Trustee as aforesaid to continue to hold as investments of the Trusts created hereunder, or either of them,

in his discretion, any and all stocks, bonds, securities or items of property, real or personal, belonging to me at the time of my death, although the same may not be of the character permissible for Trust Investments under the general rules of law or any Statute applicable thereto; and also to sell, dispose of, and change any or all of such investments at such times and in such manner as he shall deem proper; and also to invest and reinvest the proceeds of my property, Real or Personal, in such stocks, bonds, securities, or items of property, real or personal, as he may deem wise, although the same may not be of the character permissible for trust investment under the rules of law or any statute applicable thereto hereby vesting my said Executor and Trustee, Thomas F. Balfe, with all the power with respect to investment and re-investment of my estate, and the proceeds thereof, which I might personally exercise if living; and hereby specifically exempting him from all liability for any loss resulting to my estate by reason of any such investment or re-investment made or retained by him in good faith."

Mary A. Balfe's will, after providing for specific bequests with which we are not now concerned, erected two trusts for her daughters, Helen Balfe DeMott and Laura Balfe Whitney, with remainders over. Thomas F. Balfe erected similar trusts, and to distinguish them those under the will of Mary A. Balfe are designated as " Helen Balfe DeMott Trust No. 1 " and " Laura Balfe Whitney Trust No. 1 " and No. 2 as to each beneficiary under the Thomas F. Balfe will.

Thomas F. Balfe continued as executor of and trustee under his wife's will until 1925 when he resigned and thereafter, pursuant to the provisions of the will, the accountant here, Title Guarantee and Trust Company, took up those duties.

The question has arisen as to whether the Title Guarantee and Trust Company, as substituted trustee, had the same discretionary investment power as Thomas F. Balfe had under his wife's will. No " rule of thumb " exists (*Matter of White*, 135 Misc. 377), but each case must be determined upon the peculiar facts surrounding it, for no will has a twin brother and precedents of interpretation are not to be blindly followed. (*Matter of Watson*, 262 N. Y. 284; David, New York Law of Wills, § 490.)

The appointment of a trust company as substituted trustee, and the discretionary powers granted to the original trustee, having nothing to do with any family relationship, indicates, if it does not do violence to the language used, the intention that the substituted trustee should have and possess the discretion given its predecessor. (*Matter of Jenkins*, 111 Misc. 517.)

In this case, as will be pointed out, the original trustee was a large individual stockholder in the substituted trustee corporation and was a director of its close affiliate, Bond and Mortgage Guarantee Company. These are outstanding facts to be considered in the interpretation of this clause of the will.

What is the meaning of the words " in his place and stead? " Are they meaningless in this will? Could not the testatrix have provided that in the event of the resignation, death or other incapacity of her original trustee a certain other individual or corporation was " nominated, constituted and appointed executor and trustee? " My own research has disclosed no reported case construing these words, nor has the thoroughness of counsel brought any to light. Webster's New International Dictionary (1930 ed.), page 2033, says it means " to fill the place of; to replace," and Oxford Dictionary (Vol. VII, part 2, p. 947, and vol. IV, p. 13b) " the space previously or customarily occupied by some other person or thing; room, stead, lieu; often in phrases in the place of, instead of, in the room or lieu of, in exchange or substitution for; to take the place of, to be substituted for, to stand instead of."

In view of the circumstances of the estate, the fact that the decedent's husband was the original trustee and the probability that the terms of trusts which were for decedent's daughters would extend beyond the original trustee's life, it is a reasonable conclusion that it was testatrix's intention that a possible successor trustee should be fully vested with the broad discretionary powers granted by her to the original trustee in the portion of the will quoted. (*Matter of Storts*, 142 Misc. 54, 55.)

I, therefore, hold that these words, " in his place and stead," confer upon the substituted trustee the same discretionary powers as were given the original trustee.

Thomas F. Balfe died August 12, 1927, leaving a last will and testament erecting trusts for his daughters and in and by which he appointed the Title Guarantee and Trust Company executor and trustee in this language:

" *Fourteenth*. I nominate, constitute and appoint Title Guarantee and Trust Company of the City of New York, Executor of and Trustee under this my last Will and Testament, and I hereby give to my said executor and Trustee full power and authority to manage, control, invest and dispose of my entire estate, real and personal, in any manner which to my said executor and trustee shall seem to be for the best interests of my estate and those interested therein, with full power to defer, postpone and compromise the collection of any debt owing to me and with full power to settle and compromise all claims against my estate and also to

retain without liability for loss or depreciation in value, any investments and real estate belonging to me at the time of my decease and also to sell, mortgage and pledge any of the property and securities belonging to my estate and to enter into and comply with the provisions of any voting trust reorganization or creditor's agreement affecting or relating to the same with other persons interested in any corporation, firm or partnership in which I may be interested at the time of my death, or in the bonds, stocks or other securities of which my estate may be the holder, and also to partition, exchange, sell, mortgage, repair, improve, build and rebuild upon any and all of my real estate and to lease the same for any number of years not being limited by the duration of any trust, and to purchase with funds of my estate other real property whenever and upon such terms and prices as to my executor and trustee shall seem for the best interests of my estate and to execute and deliver all instruments which may be necessary in the exercise of such powers, and in all respects to deal with my estate, both real and personal, as fully and completely as I, myself, could do. I furthermore authorize and direct that my said executor and trustee may freely act under all or any of the powers by this will given in all matters concerning my estate and the trusts herein created without the necessity of obtaining the consent or permission of any person interested therein or the consent or approval of any court notwithstanding that such executor and trustee may also be acting or interested either individually or as trustee of other trusts or as agent for other persons or corporations interested in the same matters."

All these trusts as they came to the Title Guarantee and Trust Company contained a substantial number of shares of the capital stock of the Title Guarantee and Trust Company, of the Bond and Mortgage Guarantee Company, guaranteed mortgages and certificates and stock in various other corporations.

In considering the continued holding of the Title Guarantee and Trust Company and the Bond and Mortgage Guarantee Company stocks by the trustee it is to be borne in mind that there is a great difference between an investment by the trustee of moneys forming part of the estate and the retention of securities purchased by the testator and held by him at the time of his decease. In the one case the investment, whether wise or unwise, is the independent, uncontrollable act of the owner; and in the other it is the act of the trustees whose discretion is often limited and whose duties are generally prescribed either by the will or statute; and each is to be subjected, therefore, to wholly different rules, if, indeed, the act of the owner is subject to any rule whatever. (*Jones* v.

*Jones*, 2 N. Y. Supp. 844, 846, 847, reported without opinion, 50 Hun, 603; *Matter of Clark*, 257 N. Y. 132, 136; *Matter of Winburn*, 140 Misc. 18, 22.)

The accounts filed and to which objections have been made, show that on December 31, 1933, each trust contained a somewhat diversified list of corporate stock, including substantial holdings in the Title Guarantee and Trust Company and Bond and Mortgage Guarantee Company, and a number of guaranteed mortgages and certificates, the latter varying in amounts from $200 to $10,000 in thirty-eight items in the Laura Balfe Whitney Trust No. 1; from $300 to $27,100 in twenty-seven items in Helen Balfe DeMott Trust No. 1; from $25 to $21,300 in four items in the Laura Balfe Whitney Trust No. 2; and from $250 to $21,300 in four items in Helen Balfe DeMott Trust No. 2.

The objections are (1) to the retention by the trustee of ninety per cent of the shares of its own capital stock held in trust until they had depreciated from $151 (Thomas F. Balfe trusts), and $106 (Mary A. Balfe trusts) to $7.62½ at the close of the accounting period; (2) to the retention by the trustee of ninety per cent of the shares of its closely affiliated corporation, Bond and Mortgage Guarantee Corporation, held in trust until they had depreciated from $94.50 (Thomas F. Balfe trusts) and $30 (Mary A. Balfe trusts) to seventy-five cents per share at the close of the accounting period; (3) to the retention of ten per cent of the foregoing stocks until the sale thereof in May, 1933, at a large loss; and (4) to the investment by the trustee in mortgages or participations therein, owned by it in its individual capacity and sold by it as such to itself as trustee at a profit or advantage to itself.

The trustee held in all four trusts 5,555 shares of its own capital stock and 5,500 shares of Bond and Mortgage Guarantee Company. Ten per cent of this stock was sold by the trustee over a period of four days in May, 1933.

It is said that the resultant loss to the trust estate is approximately ninety-four per cent of the original value of the trust company's stock under the Thomas F. Balfe trusts and ninety-one per cent under the Mary A. Balfe trusts; and with respect to the Bond and Mortgage Guarantee Company stock, over ninety-nine per cent in all trusts. It is alleged that the loss and depreciation in the two stocks under the Thomas F. Balfe will is in excess of $900,000, including as " loss " the difference between the market price at the time the accountant received the stock and that on December 31, 1933, of the stock yet on hand. By the same method of computation, there is also a very substantial loss in the Mary A. Balfe estate.

The Title Guarantee and Trust Company was organized in 1882 with a capital of $100,000. It then had six office employees and about fifty others engaged in preparing its so-called " plant." This " plant " consists of complete transcripts of all records in the county clerks' and registers' offices of the counties in which it does a title business, maps and much other data with respect to titles, so that in a very short time one may have a complete search against any given property. One officer estimated the value of this plant at $1,000,000. Finding in the course of its experience that its business would be enhanced by the doing of a mortgage business also, that business was added, and later, banking.

Deeming it better to have the guaranteeing of mortgages done by a separate corporation, the Bond and Mortgage Guarantee Company was organized in 1892. This corporation and the Title Guarantee and Trust Company were closely affiliated, occupying the same offices, and, in the main, having the same officers. The Bond and Mortgage Guarantee Company did not, however, confine its activities to guaranteeing mortgages taken by the Title Guarantee and Trust Company only, but performed that service for others.

The business of selling to the public guaranteed mortgages and guaranteed mortgage certificates was very profitable. From 1925 to 1930 the accountant sold to the investing public an average of from $130,000,000 to $150,000,000 of mortgages each year, and by 1931 the total outstanding so sold by the accountant and guaranteed by its affiliate corporation reached the colossal sum of $921,000,000 in principal amount.

There were other corporations engaged in the same business, with the same or slightly different set-up, principally in that the others did not have a separate guaranteeing corporation.

As before mentioned, when these trusts came to the accountant here, they contained in their portfolio guaranteed mortgages and guaranteed mortgage certificates purchased from or through the accountant, and the latter, in its administration of the trusts purchased from itself the same kind of securities.

A frequently cited case laying down the general rule as to the duty and responsibility of fiduciaries is *King* v. *Talbot* (40 N. Y. 76, 85, 86), in which it was said: " My own judgment, after an examination of the subject, and bearing in mind the nature of the office, its importance, and the considerations, which alone induce men of suitable experience, capacity, and responsibility to accept its usually thankless burden, is, that the just and true rule is, that the trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent men of dis-

cretion and intelligence in such matters, employ in their own like affairs."

Many other cases express the same rule. Quotations from just a few follow: " An executor or trustee is not a guarantor for the safety of the securities which are committed to his charge, and does not warrant such safety under any and all circumstances, and against all contingencies, accidents or misfortunes. The true rule which should govern his conduct is, that he is bound to employ such prudence and such diligence in the care and management of the estate or property as in general prudent men of discretion and intelligence employ in their own like affairs. ( *King* v. *Talbot*, 40 N. Y. 76.) While this rule requires an executor or trustee to avoid all extraordinary risks in the investment of the moneys of the estate and to keep the same safely, it does not demand that he shall be made liable for contingencies which, under ordinary circumstances, could not have been anticipated." (*McCabe* v. *Fowler*, 84 N. Y. 314, 318.)

" The powers and duties of a trustee are limited and defined by the deed of trust under which he acts (*Colorado & Southern R. Co.* v. *Blair*, 214 N. Y. 497), and when that deed confers upon him a discretion as to the course to be pursued in a given contingency, and he exercises that discretion in good faith, and is guilty of no fraud or gross negligence, he cannot be called to account and mulcted in damages because some one of his *cestui qui trust* considers that he should have adopted a different course or even if, in the event, it appears that a different course would have resulted more favorably to the beneficiaries of the trust." (*Meisel* v. *Central Trust Co.*, 179 App. Div. 795, 799; affd., 223 N. Y. 589.

" The duty devolving upon a trustee under such circumstances in making investments for the trust fund is well understood. He may, by statutory authority, without risk to himself, make certain investments. [Statutes cited.] Beyond that, in making investments he is held to the duty to be faithful, diligent and prudent in an administration intrusted to him in confidence in his fidelity, diligence and prudence (*King* v. *Talbot*, 40 N. Y. 76, 84); and while he is not a guarantor of the safety of the securities in his charge belonging to the estate he is bound to exercise such prudence and diligence in the care and management of the estate as men of discretion and intelligence in general employ in their own like affairs. (*McCabe* v. *Fowler*, 84 N. Y. 314.) He must exercise sound discretion, as well as good faith and honest judgment." (*Matter of Cady*, 211 App. Div. 373, 375.)

" A more fundamental and broader principle, superseding in emergencies or justifying conditions the specialized rule, is that

trustees are bound in the management of all the matters of the trust to act in good faith and employ such vigilance, sagacity, diligence and prudence as in general prudent men of discretion and intelligence in like matters employ in their own affairs. The law does not hold a trustee, acting in accord with such rule, responsible for errors in judgment." (*Costello* v. *Costello*, 209 N. Y. 252, 261.)

" *Good faith, care and skill.* In the performance of duties imposed on a trustee, general requirements are that he exercise common skill, common prudence, and common caution, that he represent and protect the interests of all the beneficiaries impartially, and that he act honestly and in utmost good faith. So, too, a trustee must exercise sound judgment and prudence, and due diligence, or that care and diligence which an ordinarily prudent man would exercise in the management of his own affairs, * * *. However, a trustee is not an insurer of the trust property or of results, and when it is shown that a trustee has been faithful and diligent, the courts will view his acts with liberality and indulgence, and will not hold him responsible for mere mistakes or errors of judgment, or for losses not attributable to lack of fidelity; but good faith is no defense where the trustee has arbitrarily over-stepped the bounds of his authority, or where he has not exercised diligence or has acted unreasonably, or has been guilty of such gross neglect as no reasonably intelligent person would consider proper." (65 C. J. 648, 649.)

" The standards set for the trustee in the performance of his duties relate to the degree of skill and care which he must exercise, and also to the good faith which he must manifest toward the beneficiary. Only ordinary care, skill, and prudence are required of trustees. * * * The trustee is not liable for every error which occurs in the administration of the trust. He is not required to be infallible." (Bogert Trusts, 329, 330.)

Negligence is charged in that the stock of the Title Guarantee and Trust Company and the Bond and Mortgage Guarantee Company was held against a constantly falling market. In this connection, we must take into consideration the uncontradicted testimony that commencing in October, 1929, we went into and have not yet come out of the worst period of financial or economic stress known in history. This is one bit of wisdom upon which we need no testimony — we all know it; the capitalist and laborer alike has had it brought home to him. It is history that in many States (New York among the last) banks were closed upon the Governors' proclamations and, finally, all the country's banks were closed by proclamation of the President of the United States.

So-called "emergency" legislation has been enacted so fast that even lawyers could not keep abreast of it. With respect to this class of legislation, witness the so-called Minnesota Mortgage Moratorium case (*Home Building & Loan Association* v. *Blaisdell*, 290 U. S. 398). The court will take judicial notice of this situation. (*Matter of Winburn*, 140 Misc. 18, 20; *President & Directors of Manhattan Co.* v. *Williams*, [LAUER, J., N. Y. Spec. Term], 152 id. 901; *Matter of McCafferty*, 147 id. 179, 204.)

Other securities took the downward path. The record shows the trend by a fairly representative list. Proof of this is hardly necessary. With these facts before us, a trustee should not be surcharged solely because of his failure to sell securities whose market trend was decidedly downward, but, it is argued, had these two stocks been sold in, say, July, 1931, and the proceeds invested in seasoned bonds, even though their market values may have fallen, the recovery from that date would have been substantial. Should the trustees have known in July, 1931, that certain bonds would in a comparatively short time have a market recovery? Obviously, "the question whether or not the trustees were culpably negligent should be determined with reference to the situation at the time  *  *  *  and not in the light of such subsequent events as could not through compliance with their duty have been anticipated. A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by" (*Costello* v. *Costello*, 209 N. Y. 262); "if foresight were generally as good as hindsight, it would be a far more pleasant world in which to live" (*Matter of Winburn*, 140 Misc. 18, 23); a trustee "cannot be charged with a loss because of a deficiency of 'prevision and prophesy' as to subsequent happenings;" (*Matter of Mulford*, 149 Misc. 728); and "even the witless fool may pose as a paragon of wisdom after the unforeseeable disaster has occurred." (*Matter of Andrews*, 239 App. Div. 32, 37.)

After the stock market crash of 1929, the mortgage business of the Title Guarantee and Trust Company, and, of course, along with it the business of the Bond and Mortgage Guarantee Company, increased, for in 1930 and 1931 it sold more guaranteed mortgages and certificates than ever before. It seemed that investors who did not foresee the 1929 stock market debacle concluded to thereafter invest in real property mortgages, "the security eternal" (*Matter of Alexander*, 152 Misc. 354, 359). Nobody knew how long the depression would continue — reassuring statements were made by men in position to know (if any one did) and the government was issuing statements of indicated business improvement. On the question of switching from stocks to bonds, one

expert testified that it was a serious question in many minds whether in view of the prevalent talk about currency inflation it would not be better to invest in equities rather than fixed obligations. Trustees should not be surcharged for failing to sell when "in this depression there has been confusion, consternation and amazement in the councils of the mighty and those supposed to be financially wise." (PELLETREAU, S., in *Matter of Andrews*, unreported; affd., 239 App. Div. 32.)

The record is replete with evidence of the history of these two companies, of their business growth, their earnings, stock dividends, etc., which meet the test suggested, viz.: (1) What has been the history of the companies during a period of years; (2) have they paid regular dividends of regular amounts; (3) have they a proper capital structure; (4) are they wisely officered; (5) has a successful business continued over a period of time; (6) have they achieved a standing in commercial circles; and (7) have they behind them an established dividend record over a period of years? (*Matter of Winburn*, 140 Misc. 18, 22; *Matter of Leonard*, 118 id. 598, 601.)

It is interesting to review some reported cases involving the administration of estates having their genesis during past financial or economic panics or times of financial disturbances, in 1853, 1873, 1902–1903, 1914 and 1929.

In *McRae* v. *McRae* (3 Bradf. 199 [1855]) it was sought to surcharge administrators with failure to sell certain railroad stock, and with respect thereto the surrogate held: "It was urged on the accounting that the administrators should be charged with a depreciation in the value of some shares of stock in the Hudson River Rail Road Company. This investment was made by the intestate. The fact of a fall in the market value of the stock is not of itself enough to charge the administrators. The circumstances should show affirmatively that they have acted in an unreasonable manner in retaining the stock, and that the failure to sell was unjustifiable. There is no roof authorizing such a conclusion, and the objection must therefore be overruled."

*Matter of Weston* (91 N. Y. 501) involved an estate being administered in 1873. The movement of stock prices and the situation with which the executors in that case were confronted is thus stated in the report: "In January of 1873, the stock had sold at 94, but from that time on, had fallen to 85 at about the date of testator's death. He, therefore, had held it firmly on a falling market, and so strengthened by his conduct the impression left by his written advice. Letters testamentary were granted on the 6th day of June, 1873, and the judgment and discretion of the executors was then called into play, for it was possible to sell the

stock at once for about 80. Should they do so, or wait, was the important inquiry, to be answered with sole reference to the welfare of the estate committed to their care. They consulted, and took the best advice attainable and determined to wait. The stock had been above par the year before, and under all the circumstances, with the advice and example of the testator both before them, and their own justifiable confidence in the value of the stock, it is quite certain that their conclusion was reasonable, and their delay excusable. As the stock continued to fall, the reason for waiting grew stronger to men who had confidence in its inherent value. After a delay of three months, came a panic in September. A storm of fright and distrust swept over the stock market, during which valuable securities were depreciated and sacrificed, and prices dropped suddenly and low. Certainly it was no time then to sell. The stock was paid for, and the estate strong and able to carry it through the unexpected emergency. If the executors then had lost courage, and, demoralized by the alarm around them, had thrown the stock overboard at 55, or less than its cost, it would have been easy to say that the trustees chose the worst possible time in which to sell, and acted from terror and not from judgment. And so they waited again, as prudent men similarly situated would have certainly done. The depression continued during the remainder of the year, but with symptoms of improvement in the early months of 1874. In February the recovery had brought the stock back to 67. At this point, it is said, the executors should have sold; but while the price was better than that of the panic, it was little better, and still much below its value when originally received. It is easy to see now that it would have been wiser to have sold, and had the executors known then what they and we know now, they would undoubtedly have done so. But they did not and could not know. The indications pointed to an eventual restoration of value, and we cannot say that it was imprudent or unwise to expect and wait for it. But in April came another heavy fall, the stock dropping to 30, and in June of that year when their inventory was filed, it was appraised at 20, although on the 14th of that month it was selling at 15. That is the history of the first year's holding by the executors. Facts are put in evidence showing the expectation and progress of a movement for consolidation; the persistent holding by one of the executors, through the same period, of stock of the same corporation owned by him individually; and the similar holding of much larger blocks by business men of acknowledged capacity and judgment."

In *Matter of Thompson* (41 Misc. 420; affd., 178 N. Y. 554) it appeared that letters of administration were granted in August,

1902, and that the estate securities came into possession of the administrators in October following. Soon thereafter the market value of securities began to decline and the progress in this direction continued after the making and filing of the inventory. It was claimed that if the stock had been sold by October 9, 1902, there would have been no loss, and in answer to this claim the surrogate said: "In the present case, letters of administration were issued on the 20th day of August, 1902. It is said that, if the stocks had been sold by the ninth of October following, there would have been no loss upon them. If facts had been known to the administrators which would have formed a reasonable ground for the expectation of a depreciation in the market value of these securities, it might have been their duty to dispose of them within this period of fifty days; but no such facts appear. It is to be noted that the depreciation was not in a single stock, through some particular loss, or as the result of some mismanagement of the affairs, or the unsuccessful operation of the business, of a particular corporation. It was a depreciation of the stocks of several different corporations and was due to influences that affected the market generally. To foresee such periods of general depression, or periods when high prices prevail, is the constant effort of the keenest intellects in the financial world, but notwithstanding their tireless vigilance and efforts stimulated by the hope of great gains, they frequently find such knowledge too high for them. The law does not require such prescience of administrators."

In *Matter of Varet* (181 App. Div. 446; affd., 224 N. Y. 573) we find that the testatrix died in August, 1913; that the securities came into the executor's hands on September 30, 1913, and an inventory was filed approximately one month thereafter. After January 1, 1914, stock market prices steadily declined. The executor consulted from time to time with men conversant with financial matters and whose opinions were worthy of consideration, and as a result of such consultations decided to wait until the autumn of 1914. In the meantime the World War began, the Stock Exchange closed and securities of all kinds depreciated seriously with the result that when the securities had been disposed of there was a shrinkage of several thousand dollars. It was herein held that there was no basis to find the executor neglectful of the duty with which he was charged; that he constantly kept in mind the fact that it was his duty to form a judgment as to the proper time to dispose of the securities, and it was determined that the delay in the sale was due to an honest error of judgment and to circumstances which no man could have foreseen, and that if "such an executor or administrator acts in good faith and exercises his

best judgment he will not ordinarily be held personally responsible if it appears, in the light of after events, that he would have displayed better judgment, or have produced a more favorable result, if he had sold earlier " (p. 448).

*Matter of United States Trust Co.* (189 App. Div. 75, 80) involved the sale of railroad stock, and it was sought to surcharge the trustee for retaining what was at one time a good investment of railroad stock, for a period of thirteen years, the latter part in the face of a declining market, and during 1917 when general conditions were most extraordinary and the railroads had been taken over by the Federal government. Although a codicil to the will provided that the trustee should not be liable for any loss by reason of the retention of any securities which the trustee received from the executor (which exemption does not absolve a trustee from watchfulness and sale of securities where prudence so dictates), it was held that the trustee should not be liable because of these extraordinary conditions and stock market depreciation.

In *Matter of Andrews* (239 App. Div. 32) decedent died in November, 1930, and letters testamentary were issued January 5, 1931. When distribution was made there had been a considerable shrinkage in values so that certain specific legatees were paid nothing and there was no residuary, although at the time of decedent's death the then market values of securities would have enabled the residuary legatee to get in excess of $200,000. The decedent had a block of 17,000 shares of Continental Insurance Company stock. The executors sought advice and the concensus of opinion was that securities even at decedent's death were below their intrinsic worth. A better market was expected before the close of 1931 than that which prevailed in the forepart of that year. The Continental stock sold between seventy and eighty in 1930, and as high as one hundred and ten in 1929. Portions of this stock were sold at fifty and other portions at forty-eight and one-half. In November, 1931, the executors, unable to get any light on the course to follow, concluded they should liquidate and accordingly sold all securities with the exception of the remaining Continental Insurance Company stock which was distributed in kind. The court determined that there was no basis for holding the executors negligent in the course they pursued.

*Matter of Clark* (257 N. Y. 132) is a leading present day case. The testator was a large holder of the common stock of two sugar companies. The testator died in 1920. One stock in the executor's accounting was valued at twenty-two dollars per share, the other at twelve dollars and twenty-five cents per share, while in this accounting of the trustee the values were seven dollars and fifty cents respec-

tively. The surrogate determined that the trustee should have sold at certain times at certain prices and surcharged them. The Court of Appeals in this case said: " The Surrogate determined that the trustee should have sold in September, 1927. Yet from the preceding December of 1926, the market prices for Cuban American had consistently fallen, the high and low for each succeeding month being lower than for the preceding. The same consistent decline followed through to the date of the accounting. The fall was due solely to the oversupply of sugar in the markets of the world. An oversupply of a commodity, compelling sales at prices netting little or no profit, in the long run necessarily induces under planting, which in turn is productive of higher prices for the commodity, and increased profits to the producer. Here was a sugar company, coming through a period of depression with assets unimpaired, with a book value greater rather than less, with liabilities reduced rather than increased, with a cash condition notably sound, able to survive if any sugar company might. Under these circumstances was it the part of wisdom to sell the stocks at what each month may well have seemed bottom prices? With all the advices which the trustee received from those well versed in the sugar trade and in finance, and those experienced in the vagaries of the Stock Exchange, counseling delay, how can it be said that it was negligent in omitting to make prompt disposal of the stocks? Under the circumstances, we think that the trustee, as the event has proven, was guilty, at the very most, of an error of judgment, in not making sale of the stocks at an earlier date. It may have been deficient in prevision and prophesy; it was not lacking in the exercise of care. Therefore, even if the immunity from liability provided for by the testator does not cover the case, we think that there has been no fault and that it was error so to find."

Involving very similar facts are the cases of *Green* v. *Crapo* (181 Mass. 55, 58; 62 N. E. 956) and *Matter of Lazar* (139 Misc. 263).

The depression alone, however, will not be sufficient excuse for a trustee must be constantly watchful of his security portfolio, and he may not willfully speculate. (*Matter of Stumpp*, [DELEHANTY, S., N. Y. County], 153 Misc. 92; *Matter of Cady*, 211 App. Div. 373, 376; *Villard* v. *Villard*, 219 N. Y. 482; Perry Trusts & Trustees [7th ed.], § 465; Trusts, 65 C. J. 796.)

It is undisputed that all trusts were in the immediate charge of the trust officer; that a record of all trust holdings was kept in a book especially ruled for that purpose; that once each week the trust security holdings were reviewed by a committee consisting of the trust officer, a statistician and another, each session review-

ing in alphabetical order as many trusts as could be covered during the particular sitting of the committee, all the trusts being covered in approximately six weeks; that if any member of this committee had any question in his mind in regard to the sale or retention of any particular security, that question was passed on to another committee known as the Manhattan administration committee which in turn, if it desired the advice of better qualified men, prepared a requisition to the finance committee, copies of which went to each member thereof a day or two in advance of that body's meeting, and that committee's action was reported back. The finance committee was composed of certain officers of the trustee corporation, men who were directors in nationally known corporations, banks, insurance companies, railroads, colleges, etc. A member of the subordinate committees was conversant with the action of the finance committee. Although not always reflected in the minutes of the finance committee, the members have testified that the financial condition of both Title Guarantee and Trust Company and Bond and Mortgage Guarantee Company was constantly before them, and the advisability of holding these stocks as investments was frequently discussed. I do not think the watchfulness of trust securities can be criticised. (*Matter of Clark*, 257 N. Y. 132, 138.)

It is unfortunate that the stocks of these two corporations held in these trust portfolios were not sold in or about July, 1931, but we cannot say that the individuals having charge thereof should have foreseen the present day situation. They erred in judgment, it appears retrospectively, but to err is human, " all men of honesty, prudence and enlightenment do not think alike." (*Costello* v. *Costello*, 209 N. Y. 252, 264.) We cannot say that reasonable men might not unreasonably have made the decision these men reached. (*Ward* v. *Clark*, 232 N. Y. 195.)

I shall not detail the manner of making mortgage loans other than to say that the applicant was required to fill out a detailed application form which was considered by a committee known as the " afternoon mortgage committee;" if it was not peremptorily declined, it was referred to the appraiser who made a report thereon from information in the office. Then the appraiser viewed the property and later, particularly if the loan asked was large, the application was referred to the mortgage loan committee composed of eminent real estate appraisers and operators.

These mortgages were held by banks, trust companies, fiduciaries, colleges and others, and this fact is some evidence of what prudent men were doing in the circumstances. (*Chemical Bank & Trust Co.* v. *Reynaud*, 150 Misc. 821, 823.)

It is urgently presented, and not without considerable authority, that a trustee cannot deal with itself; with particular reference to this case, that the trustee should not have purchased guaranteed mortgages and mortgage certificates from itself. (*Ackerman* v. *Emott*, 4 Barb. 626, 648; *Fulton* v. *Whitney*, 66 N. Y. 548; *Matter of L. I. L. & T. Co.* [*In re Garretson*], 92 App. Div. 1; affd., 179 N. Y. 520; *Smith* v. *Howlett*, 29 App. Div. 182; *Magruder* v. *Drury*, 235 U. S. 106; *Matter of Clift*, 135 Misc. 4; *Crummey* v. *Murray*, 130 id. 378; *Matter of Harbeck*, 142 id. 57; *Matter of Kirkman*, 143 id. 342; *Matter of Peck*, 152 id. 315.)

While general principles are to serve as guides and not be lightly discarded, every case must be determined on its own facts. Here, in the Mary A. Balfe estate, the husband was executor and trustee, he was a director of the Bond and Mortgage Guarantee Company, both husband and wife had themselves purchased these mortgages from the accountant, and with " this insight " into the operations of these two companies, it is a fair construction that both Mr. and Mrs. Balfe authorized investments in this manner, that they preferred mortgage investments made by their own corporation, so to speak, rather than by corporations in which they had no part in the management and with which they were not so familiar. In the Thomas F. Balfe will the testator disposed of this question when he provided that the trustee might freely act under the power given it and without obtaining consent of any beneficiary or court " notwithstanding that such executor and trustee may also be acting or interested either individually or as trustee of other trusts or as agent for other persons or corporations interested in the same matters."

That these decedents themselves invested in these securities and in this manner is evidence of the intention to be given their wills. (*Matter of Winburn*, 140 Misc. 18, 20.)

Lack of diversification is urged as improper management. No New York case has been cited in support of this proposition, and it is doubted if our courts would so hold in the absence of controlling statute. (*Matter of Adriance*, 145 Misc. 345, 352.) " At the present time the trustee has the right, as long as he keeps within the law, to ' put ' all his ' apples in one basket.' The cases are frequent of this happening." (SLATER, S., Testamentary Trust Funds; Should State Compel Safe Investment, N. Y. State Bar Bull. Mar. 1934, vol. 6, No. 3.) Men may honestly differ in their opinions upon this subject; witnesses in this case testified that in their judgment it is better to make a study of and be thoroughly familiar with a small number of securities; and, moreover, diversification is claimed here because the Title Guarantee and Trust Company is engaged

in the businesses of title insuring, mortgage loaning and banking, and the mortgages it takes are upon different classes of property, residence and business, in different localities, and owned by individuals (where there is individual ownership) in all walks of life. (*Matter of Flint*, 240 App. Div. 217.)

*Matter of Dickinson* (152 Mass. 184; 25 N. E. 99); *Matter of Davis* (183 Mass. 499); *Kimball* v. *Bates* (233 id. 321; 123 N. E. 665), and *Harvard College* v. *Amory* (9 Pick. 446) are cited as holding diversification of securities being required as matter of law. The first three cases do not unqualifiedly so hold, the investments therein being disproportionately large in securities of questionable soundness, but the *Kimball* case (pp. 331–332) does hold that " while some investment of trust funds in certain securities might be justified, a disproportionate amount of the total ought not to be embarked in a single kind of stock or bonds," citing the other cases as authority. In my judgment and in the absence of statute, courts should not hold as matter of law that lack of diversification is in and of itself negligence.

A question of evidence will be noticed. Evidence of conversations between officers and members of the finance committee of accountant and Thomas F. Balfe as to the latter's feeling toward the stock of these two corporations and their mortgages was admitted. This evidence, it is said, contradicts, enlarges or varies the written will. It was not admitted for the purpose of so doing, but was properly admitted to show the testator's own evaluation of these securities, as one of the reasons for the accountant's holding the stocks and investing in the mortgages, and not as evidence necessarily controlling if it should be determined that prudent men would not have so invested. Such evidence has been admitted in reported cases. (*Matter of Weston*, 91 N. Y. 501, 508; *Matter of Clark*, 257 id. 132, 137; *Matter of Winburn*, 140 Misc. 18, 20; *Ackerman* v. *Emott*, 4 Barb. 626.)

The briefs, which total 400 pages, discuss many other details of this case which have all been considered, although not touched upon in this opinion.

The objections are dismissed.

Settle decree on five days' notice.