In the Matter of the Accounting of CITY BANK FARMERS TRUST COMPANY, as Trustee under an Agreement Made with SAMUEL E. BLOCH et al., Deceased, Petitioner.

MAX H. BLOCH, Individually and as Executor of ROSA H. BLOCH, Deceased, et al., Respondents.

Supreme Court, Special Term, New York County, January 24, 1947.

*Edwin W. Cooney* and *I. J. Quesenberry* for petitioner.

*Karl A. Kohn* for Max H. Bloch, individually and as executor of Rosa H. Bloch, deceased, respondent.

*William M. Lowell* and *Moses S. Adler* for Mary B. Adler, individually and as executrix of Rosa H. Bloch, deceased, respondent.

*Albert Blumensteil,* guardian ad litem for Howard M. Bloch, an infant, and Stanley H. Bloch, a person in military service, respondents.

SHIENTAG, J. The corporate trustee moves for an order modifying the referee's report so as to overrule his recommendations allowing certain objections to its account; the objectants move for an order confirming the report.

This proceeding was brought for the judicial settlement of the account of the petitioner, as trustee, under an *inter vivos* trust agreement made in 1919 by Samuel E. Bloch and Rosa H. Bloch. By the agreement Samuel E. Bloch transferred policies of life insurance and certain moneys to the corporate trustee (the petitioner) under an agreement that after the death of Samuel E. Bloch there should be paid to his widow, Rosa H. Bloch, during her lifetime, the sum of $400 per month, principal to be used to the extent necessary to make up such amount, and that after her death there should be paid to each of the two children, the objectants herein, the sum of $150 per month out of the combined income and principal of their respective trusts. There were provisions disposing of the remainder. Loans were outstanding on the policies, but after his death on January 16,

1928, the executors of the estate of Mr. Bloch discharged them as they were required to do by the will. In all, the trustee received a total of $53,130.23. At the time of Mr. Bloch's death, his widow was seventy-four years old. She died in 1937.

The trust agreement authorized the trustee to invest the funds " in such securities as it may seem wise without being limited to the class of securities in which trustees are authorized by law to invest trust funds * * *." It was obvious from the beginning that the principal would have to be invaded, for, by the terms of the trust, it was necessary to pay Mrs. Bloch $4,800 annually and at best, not over 6%, or about $3,000 could be realized by investment. This required an investment which in addition to reasonable safety possessed a certain amount of liquidity.

Before going into the details of the investments made, it is well to refer to the law generally applicable to the duties and responsibilities of a trustee in the position of the petitioner in this proceeding. That law may be formulated as follows: (1) Generally speaking, and in the absence of any agreement to the contrary, a corporate trustee has no greater duty or responsibility than an individual acting in the same capacity (*Matter of Ryan*, 291 N. Y. 376, 394–395; *Matter of Union Trust Co.* [*Hoffman's Estate*], 219 N. Y. 514; *Matter of Clark*, 257 N. Y. 132). (2) A trustee is not an insurer; he is not infallible; he is not called upon to use an extraordinary degree of care and prudence. He must, however, exercise reasonable care and prudence. Those on their face are terms which may be thought irritatingly vague, but in their practical application they reflect a recognizable standard. What constitutes reasonable care and prudence necessarily depends upon the circumstances of a particular case. A trustee must carry out the terms of the trust with the same care that an ordinarily prudent man would exercise in the management of his own affairs. He must bestow the care and skill which the situation demands. The standard of conduct exacted of him is one of reasonable, not the utmost amount of, prudence and diligence (*King* v. *Talbot*, 40 N. Y. 76, 85). (3) In determining whether, in a given case, a trustee has acted with reasonable prudence and diligence, we must " look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently took place " (*Purdy* v. *Lynch*, 145 N. Y. 462, 475–476). " A wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello*, 209 N. Y. 252, 262.) (4) A trustee who makes

investments of the type unauthorized by statute, unless his powers are modified by the deed of trust, acts at his peril and is liable for any loss, no matter how great the care he exercised (*Matter of Smith,* 279 N. Y. 479). There is no reason of public policy, however, that prohibits the settlor of a trust from conferring upon the trustee broader powers of investment than are permitted by statute. But " A provision in the terms of the trust authorizing the trustee to exercise his discretion in making investments is not interpreted as permitting him to make investments which a prudent man would not make." (2 Scott on Trusts, § 227.14, p. 1228; 3 Bogert on Trusts, Part 2 [1946 Rev. ed.], § 684, p. 392). As the learned referee has stated in his opinion, an imprudent investment even in legals and under an investment clause conferring broad discretionary powers, is not justified (*Matter of Marshall* v. *Frazier,* 159 Ore. 491; *Delafield* v. *Barret,* 270 N. Y. 43, 48; *U. S. ex rel. Willoughby* v. *Howard,* 302 U. S. 445). (5) Diversification of investments is not required as a matter of law (*In re Beebe's Estate,* 52 N. Y. S. 2d 736, affd. 268 App. Div. 1051). The failure of a trustee to diversify the investments, in the absence of a requirement so to do in the deed of trust, does not, in and of itself, constitute a lack of reasonable care and prudence in the management of the trust estate (*Matter of Adriance,* 145 Misc. 345; *Matter of Balfe,* 152 Misc. 739, 755; *Matter of City Bank Farmers Trust Co.* [*Crane*], 270 App. Div. 572, affd. 296 N. Y. 662). In the last analysis, the question resolves itself to one of reasonable prudence in making investments. (6) Where the deed of trust provides for an invasion of the principal in order to secure an increased income for the beneficiary, a certain degree of liquidity in the investments is necessarily required. Whether and to what extent the need of liquidity necessitates diversification of investment depends upon the nature and character of the investments made and the individual requirements of the trust.

The facts concerning the investment of the moneys in the trust are as follows: In March, 1928, the trustee had collected about $40,000 on the life insurance and it was necessary to invest this money. On March 13, 1928, the trust administration department informed the investment department of the requirements of the trust. At this time the trustee was purchasing from the Lawyers Title & Guaranty Company a guaranteed mortgage of $170,000 made by Cedar Rivers Corporation, covering premises 39–43 East 61st Street, Manhattan. The premises were improved with one five-story and two four-story and basement brownstone buildings, occupied as apart-

ments and studio dwellings. The mortgage carried interest at the rate of 5½%. The Lawyers Title & Guaranty Company was paid ½% for its guarantee. The mortgage was purchased in April, 1928. Certain investigations were made, but it probably is the fact that the trustee, as was customary at that period, placed a great deal of reliance on the guarantee of the mortgage company (*Mills* v. *Bluestein,* 275 N. Y. 317).

Of this total mortgage a participating interest of $37,000 was assigned to the Bloch trust. Other participations were parceled out by the trustee to other trust estates under its control. During the running of the Bloch trust, certificates were sold to other trusts by the trustee amounting to $4,500 to provide income remittances to Mrs. Bloch. The amount involved in the claimed surcharge is $32,500. When this investment was finally disposed of after the liquidation of the title company, there was a net of $8,287.50 received by the trust, which represented a principal loss of $24,212.50. There was also a substantial loss of income. The referee surcharged the loss of principal and income, saying of this investment: " It was, to be sure, a ' legal ' investment but that does not settle the question. ' A fiduciary who invests in securities within the specified classes is not by the statutes freed from liability for resultant losses if he fails to exercise reasonable judgment and discretion in making the investment (*Delafield* v. *Barret,* 270 N. Y. 43–48).' "

Although the appraised value of the property was at least 50% in excess of the mortgage loan, the referee made five criticisms of the investment, which may be summarized as follows: (1) Failure to become acquainted with the then condition of the buildings; (2) failure to investigate the financial responsibility of the bondsmen, apart from their ownership of the mortgaged premises; (3) failure to become informed as to the operating costs of the property; (4) failure to have further information with respect to the number of rooms in the building and in the several apartments and the character of the occupancy of those rooms, and (5) failure to inquire as to the previous history of the property, cost of the buildings and their reproduction value.

These criticisms may be disposed of as follows: (1) The trustee had a report made in April, 1928, by the appraiser for the Guaranty Company stating that the condition of the buildings was good. There is no proof that this report was inaccurate and no reason is given why the trustee was not justified in relying thereon. (2) There is no requirement in law that the obligor on a mortgage bond shall have independent financial

resources. The trustee was justified in relying entirely on the value of the mortgaged property (*In re Beebe's Estate*, 52 N. Y. S. 2d 736, affd. 268 App. Div. 1051, *supra; Matter of Rolston*, 162 Misc. 194). (3) A witness for the trustee named Barnes stated that he knew the taxes and the amount that would have to be paid for interest and that by deducting those items from the gross rents which he knew to be $17,900, he could deduce how much was available for operating expenses. It developed at the hearing that the actual operating expenses were only $2,000 and that there was a balance over and above the interest and taxes of some $3,690. While the trustee should have acquainted itself with the amount of operating expenses when it made the loan, there is nothing to show that the failure to make this inquiry operated to the disadvantage of the trust estate or would have changed the determination of the trustee to purchase the mortgage. (4, 5) As to the number of rooms in the building and the character of their occupancy and the previous history of the premises, including the cost of the buildings and their reproduction value, it seems obvious that these questions would not have affected the determination to invest. I conclude therefore that there is no basis for any surcharge on this investment.

The second investment which was held by the referee to be improvident is the investment in February, 1930, of $8,600 in the so-called Kutner mortgage. This presents a more debatable question. It was not a guaranteed mortgage but it did not turn out badly so far as loss of principal is concerned. Out of the $8,600 invested in the mortgage for this trust estate, there was a loss in principal of only $265.14. There was, however, a considerable loss of interest on the investment. The mortgage carried 6% interest. The referee surcharged the loss of principal and interest on this investment for four reasons: (1) Negligence in accepting an appraisal for the building at $48,000 when the owner had only valued it at $40,000; (2) failure to obtain information concerning the financial condition of the owners of the property; (3) negligence in accepting a bond signed by Kutner when it was provided that the bond would be signed by a corporation controlled by Edgar A. Levy; (4) lack of diversification on the ground that too much money of the trust had already been put into mortgages.

The first application for a mortgage on the premises in question was received by the trust company on September 27, 1929, from Charles F. Noyes Company, Inc., requesting $90,000 at 5½% for five years. That application reported the value of

the property as, Land $150,000; Building $40,000; Total $190,000. The application was considered by representatives of the trust company and an experienced appraiser was requested to give a valuation of the premises which he noted as Land $66,000 to $82,500.; Building $54,000 to $60,000; Total $120,000 to $142,500. The $90,000 loan was declined.

On January 10, 1930, a second application was received from Douglas L. Elliman Co. for $75,000 at 6% for three years on the same premises which consisted of a two-story, part cellar brick-front garage on a plot of land 75' x 100' 5", located on the north side of East 48th Street, 100 feet east of First Avenue. The application reported that the premises were leased at a net rental of $11,000 per annum to August 15, 1934, and at $12,000 per annum to August 15, 1939, with a lease secured by six months' rental. The net rental was one whereunder the lessee paid all operating expenses, insurance and taxes, in addition to the rent reserved. The application was presented to the real estate committee of the board of directors of the trust company on January 15, 1930.

The loan was approved by the real estate committee of the trust company on January 15, 1930, subject to appraisal and approval of counsel, at $75,000 for three years at 6%. There was a certificate of appraisal dated January 20, 1930, giving a land valuation of $82,500; a building valuation of $48,500, making a total of $131,000. The trust company was justified in finding the value of the property to be more than 50% in excess of the amount loaned thereon.

The parties never intended to have personal security on the bond. Although it had been provided that the bond was to be signed by a corporation owned or controlled by Edgar A. Levy, there is nothing to indicate that such a corporation would have been financially responsible. In making the loan the trust company was bound to look to the value of the property and not to the financial responsibility of the bondsman.

The only serious criticism in connection with this investment, in my opinion, is the lack of diversification. The mortgage, as has been stated, was not guaranteed by a title company and was not readily salable. If the original investment of $37,000 in the 61st Street property was of such a nature that it could not readily be liquidated to meet the required invasion of principal, then it might be said that there was a negligent management of the estate by failure to diversify and to make such investments as could be readily realized on, to carry out the purposes of the trust. It appears, however, that at the

time that the Kutner loan was made, the original investment of $37,000 had a high state of liquidity. Guaranteed mortgage participations were readily salable. Up to the time of the investment in the Kutner mortgage, the experience of the trustee with the guaranteed mortgage participation investment in this fund had been entirely satisfactory. Up to then it had been demonstrated that whenever it became necessary to invade the principal of this fund to make up the annuity for Mrs. Bloch, a portion of the guaranteed mortgage participations could be converted virtually overnight into cash in whatever amount might be required. In fact, such participations were readily sold throughout 1931. On the basis of liquidity alone, therefore, it was not essential to diversify the investments.

The point is made, however, that from the standpoint of safety of principal, a trustee exercising reasonable prudence would have reserved a substantial sum, such as the $8,600 which it put into the Kutner mortgage, for some other type of investment. True, the height of caution might have impelled the trustee to invest those $8,600 in Government bonds with a low rate of interest.

An examination of the terms of the trust indenture warranted the trustee in coming to the conclusion that the settlor of the trust wanted as much income to be derived from the investments made as was consistent with safety. This is indicated by the fact that he not alone failed to restrict the types of legal investments which the trustee could make, but he went further and authorized the trustee in its discretion to make investments which were not of the type permitted by statute. If we carry ourselves back to the period from 1928 to 1930, we find that guaranteed mortgage certificates were regarded in common parlance as "gilt edge" safe investments. It is true that there was a severe break in the stock market in 1929 but at least until 1931 optimistic views were entertained concerning financial conditions in the country.

The whole subject of mortgage participations has been widely litigated and discussed since the real estate panic in this city. In Scott on Trusts (Vol. 2, § 227.9, p. 1213) it is said: "A fourth objection is that ordinarily there is no market for such participating interests, other than that created by the trustee in repurchasing them for itself or for its various trusts. As long as the real estate market is reasonably good no difficulties appear; the participating interests are transferred and re-transferred at their face value and are treated as the equivalent of cash and at the same time afford a very good return on the

investment. When after a few years of the depression which began in 1929, however, the real estate market went to pieces, the participation certificates ceased to be worth their face value and became to a large extent unmarketable. Where the mortgages were based upon the inflated value of real estate prior to the depression, the losses were sometimes large. Similar losses, however, were suffered in the case of individual mortgages." This would pass for a description of what occurred in the administration of this trust.

We cannot say that the reliance of the trustee on the kind of liquidity furnished by mortgage participations and the safety of mortgage investments prior to 1930 was unreasonable, in view of well-nigh universal practices in the community. From the point of view of later experience it is apparent that the market for certificates was entirely dependent on the continued existence of a strong real estate market, a situation which we now know to have been quite precarious. The dislocation of one branch of our economy as evidenced by the decline in the stock market, brought other dislocations, some immediately, some more slowly. Indeed, it was not until shortly before the bank holiday that the serious condition of mortgage guarantee companies was realized.

In *Matter of Flint* (240 App. Div. 217, 226–227, affd. 266 N. Y. 607) CARSWELL, J., said: " The law is not unmindful of common knowledge. Conservative men of sound discretion in managing their own affairs with what then seemed prudence and foresight during this period have had experiences similar to that of the trustee here. The law is reasonable in its exactions. The law does not exact prescience of a trustee. The disaster or stagnancy which befell these securities in 1933 is chargeable, therefore, to conditions arising subsequent to the early part of 1931, when the trustee acted. Adjudging the trustee's acts in prospect as of the early part of 1931 and prior thereto, there is revealed on this phase no want of prudence, in view of conditions then prevailing." (See, also, *Matter of Clark*, 257 N. Y. 132.) Similarly, in *Matter of City Bank Farmers Trust Co. (Crane)*, (270 App. Div. 572, 576, affd. 296 N. Y. 662) the court (GLENNON, J.) said: " In determining the propriety of the acts of a trustee we must ' look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently took place.' (PECKHAM, J., in *Purdy* v. *Lynch*, 145 N. Y. 462, 475, 476.) We are inclined to the view that the investment by the appellant in the mortgage was proper at the time it was made * * *.

We cannot say that the investment made in 1928 was an improvident or careless one. At that time the accountant could not well have foreseen what was to and did take place in the real estate market some few years later."

The mortgages invested in, covered different types of property and opinions might reasonably differ as to the advisability of further diversification at this time. There had been a substantial break in the market. A prudent trustee might well have thought that investment in stocks or bonds would be hazardous in view of the risk of market fluctuations. People were getting out of the stock market. The real estate market was then holding up well. Sufficient liquidity for the purposes of the trust had been provided by the earlier investment in guaranteed mortgage certificates. The trustee in the exercise of reasonable care and prudence, might have come to the conclusion in February of 1930 when it invested in the Kutner mortgage, that it was safer to put the trust funds into a real estate mortgage than into stocks and bonds. That it was not entirely mistaken in its judgment is shown by the fact that the depreciation in principal, so far as this investment is concerned, was only several hundred dollars. True, the loss of income was substantial, but there is no telling what that loss might have been if investments had been made at the time in preferred stocks or in bonds. When a trustee makes a decision for which there is a reasonable basis, it is not for the court to say that it would have acted differently and charge the trustee for the loss that has occurred. The trustee may have made an error of judgment in investing in the Kutner mortgage, but that error does not stamp its conduct as careless or improvident. On the whole, therefore, I conclude that there is no reason for surcharging the trustee for the loss of principal and income sustained in connection with this Kutner investment.

So far as the record discloses, there is no basis for any surcharge because of undue or improper retention of any of the investments made for this trust.

The question of allowances will be considered and affidavits relating thereto received on the settlement of the final judgment. Settle judgment in accordance with the foregoing determination.