In the Matter of the Application of CHARLES W. OSBORN for the Removal of the CITIZENS TRUST COMPANY OF PATCHOGUE as Trustee under an Agreement Dated January 24, 1928, and for a Judicial Settlement of the Account of Such Trustee, and for the Appointment of a Successor Trustee under the Terms of Said Agreement.

In the Matter of the Application of CITIZENS TRUST COMPANY OF PATCHOGUE for Leave to Account and Resign as Trustee under a Certain Indenture Bearing Date the 24th Day of January, 1928, and for the Appointment of a Successor Trustee.

BERTHA M. OSBORN, Remainderman, Appellant; PATCHOGUE CITIZENS BANK AND TRUST COMPANY (Formerly CITIZENS TRUST COMPANY OF PATCHOGUE), Trustee, Respondent; HELEN M. OSBORN, Life Tenant, Respondent.

(Consolidated Proceedings.)

Second Department, November 12, 1937.

*Stanley Gray Horan*, for the appellant.

*Leslie J. Tompkins*, for the trustee, respondent.

*John J. Kuhn*, for the respondent Helen M. Osborn.

DAVIS, J. After somewhat protracted and comparatively fruitless litigation, the trustee rendered an intermediate account. There were objections by one claiming to be a contingent remainderman. After a hearing before an official referee, the account was approved. At Special Term the order, among other things, confirmed the report of the referee. The appeal is from that order.

On January 24, 1928, Charles E. Osborn and his wife, Helen, entered into a trust agreement with the respondent bank (under a different name) as trustee. Both of the settlors of the trust contributed to the trust estate, which consisted of all their property, both real and personal.

In brief, the terms of the trust were that the trustee was to manage and invest the trust property without being required to invest in " legals; " and with full power to sell, mortgage or borrow for the purposes of the trust. It was provided that all income, after deducting proper charges and expenses, should be paid, " *First*. To Charles E. Osborn during his lifetime. *Second.* Upon the death of Charles E. Osborn to Helen M. Osborn during her lifetime." The remainder was given to their only son, Charles W. Osborn, if he survived the life tenants, otherwise to be paid to the " legal heirs of said Charles W. Osborn."

At the time this agreement was made it was known that a substantial portion of the trust property consisted of real estate unproductive of income. This included the residence of the parties, in which they continued to live. The agreement further provided that the trustee was authorized and directed " to advance from the corpus of the trust herein created, any sum, or sums of money, as in its judgment may be necessary for the proper support and care of said Charles E. Osborn and, or Helen M. Osborn, and for the proper upkeep, taxes, insurance and other expenses in

connection with the properties herein conveyed." Further, the trustee was authorized and directed to pay any outstanding obligations of the settlors and " to hold, in its discretion, any of the property and security herein conveyed, in the form and manner, as transferred to it by this Agreement, or otherwise."

The trustee accepted the trust and covenanted that it would faithfully perform and discharge all the duties of its office as trustee.

There was annexed to the trust agreement a list of the properties owned by the settlors, which consisted, in part, of lots in different localities, the homestead, and some real property apparently productive of income. In addition, there were bonds and mortgages aggregating about $28,000, and a certificate for twenty shares of the stock of a fire insurance company, valued at $7,000, which had theretofore been pledged by Mr. Osborn as collateral security to the bank for a note.

About four and one-half years later Mr. Osborn, the life tenant, died. The widow was surviving at the time of the accounting, and still survives. The death of Charles W. Osborn, the remainderman, occurred about a month later than that of his father. His widow has been made a party to the accounting and is the objectant.

Without going into detail, the account filed by the trustee showed that at the time the trust agreement was made, Charles E. Osborn was obligated as maker of certain notes aggregating $18,000, which the trustee has since paid. Another note, for $2,500, given to this bank in 1927, secured by the fire insurance stock, with the accrued interest, has not been paid. There were mortgages on part of the property in comparatively small amounts, which with accruals of interest, have not been paid.

The account shows that the value of the property coming into the hands of the trustee amounted to about $35,000 of personal property (including the fire insurance company stock), and real estate of the estimated value of upwards of $178,000, or a total of about $214,000.

The account was dated January, 1934, and showed income of about $21,500 received and paid out during the period. Some of the real property had evidently been sold on contract, and the amounts received therefrom, and for payments on mortgages, amounted to about $38,500. As to the fire insurance company stock, it had depreciated in value from $7,000 to $3,100, and still remains in the bank as collateral.

During the lifetime of the husband the trustee paid out on account of Charles E. Osborn, for current expenses, bills for telephone, gas, electricity, coal, groceries, taxes, insurance, and the like, and

for repairs and upkeep of the property, about $26,000. The method of payment generally was, when the bills were sent in, to give checks therefor to Mr. Osborn. There is no objection to this portion of the account.

In addition, it appears that at the time the trust agreement was made Mr. Osborn for a long time had had a checking account in this bank. During the four and one-half years that this trust was operative as to him as life tenant, Mr. Osborn continued to draw checks on this individual account as before. There were some deposits by the trustee in this account, but in the main such checks represented overdrafts, permitted by the bank in its individual capacity. They amounted to upwards of $60,000. The trustee claims interest on these overdrafts. As an apparent afterthought the trustee claims these sums represent money "borrowed" by it under its granted powers.

As far as this record shows, there was no supervision by the trustee in respect to the checks that Mr. Osborn drew. There seems to have been no trust officer who had particular charge of the estate. The principal officer of the bank testified that Osborn disbursed the money "as he saw fit." Very little is disclosed as to the purposes of these disbursements.

Principally, the question here arises in relation to this $60,000 disbursed by Mr. Osborn personally and the resulting overdraft, and about $9,000 claimed as interest thereon, represented by objections numbers 5 and 6. This forms the basis of the objections that the administration of the estate has been neither legal nor prudent. The claim of the appellant is that in permitting Mr. Osborn to draw such checks, without supervision or restraint by the trustee, the latter surrendered the judgment and discretion confided to it in the trust agreement and became merely passive. The result of these unauthorized expenditures, it is claimed, imperiled the integrity of the trust estate and greatly diminished the amount applicable to the support of the widow, the surviving life tenant. This finds support in the evidence, for the amount of income later paid over to her, both for current expenses and for her personal use, was greatly out of proportion to that expended by the husband; and as time went on it was diminished — the reason being, as stated by the trust officer, "But the conditions surrounding the properties and those things are different, and they are growing tighter all the time." It is stated and not disputed that, since the time of accounting, payments to the widow have entirely ceased. This very likely is due to the fact that the income is barely sufficient to pay such current expenses as repairs, taxes, insurance, and the like; and that the unproductive real property is not marketable or of sufficient present value to furnish security

for mortgages. Further, the bank has become greatly concerned with the indebtedness to it on notes and interest left unpaid, and on the overdrafts; and its interests clash with those of the life tenant and remaindermen.

It may be stated that there is here no claim of fraud or malfeasance on the part of the trustee. The charge, as already stated, is mismanagement and the abandonment and surrender of the judgment and discretion of the trustee, in respect to expenditures, to that of the life tenant, Mr. Osborn. There are other objections to the account which we deem of comparative unimportance. The payment for legal services was justified, and the explanatory notes in the account were merely informative and had no probative effect. The apparent decline in the market value of the fire insurance company stock furnishes no ground for surcharge under the circumstances shown. (*Matter of Andrews*, 239 App. Div. 32.)

The son, Charles W. Osborn, had a vested remainder, subject to be divested if he failed to survive the life tenants. It seems that before his father's death he became dissatisfied with the method of administering the estate in respect to the free and unlimited power given his father to draw checks for purposes undisclosed. He took the matter up with the trustee and it was then agreed that only such checks should be paid as he approved. About this time he instituted proceedings for the removal of the trustee, and shortly thereafter the trustee petitioned the court to account and to resign. Both proceedings were consolidated, and it was eventually determined that the trustee should not be removed and would not be permitted to resign, but was directed to account. After the death of the son, his widow, the appellant, was made a party, as heretofore stated.

The checks drawn by Mr. Osborn on the bank during the trust period show no particular sequence or consistency in time or in amount. They represent a condition where a man may draw on his own bank account as he pleases. It may be said that during the month of June, 1931, the total amount so withdrawn amounted to $1,800, and in July to $1,500. No satisfactory explanation could be given as to the purpose of these expenditures.

Obviously the trust granted very broad powers to the trustee. The life tenants, and particularly Mr. Osborn, who was evidently providing for his wife, and perhaps in part for his son, were entitled to something more than mere subsistence; and the whole trust estate might properly have been expended for their benefit so that they might live in a station comparable to that to which they were accustomed in so far as the funds available permitted. That rested entirely in the judgment and discretion of the trustee, and in no one else.

We conceive the duty of the trustee at the outset to have been that it take stock of the property in its hands, the obligations of the settlors, represented by notes and mortgages which it was authorized and directed to pay, the income to be derived from the trust property, and the value of the real property aside from the residence, and its availability for sale or mortgage, to the end that sufficient cash assets should be provided from time to time and, when necessary, to invade the corpus of the estate to furnish proper support and care of the life tenants. It was required to have in mind not only the benefits to be bestowed on the husband, but also the contingency that the wife might survive him; and that it was necessary to conserve the property for her support during the remainder of her life. As far as it appears, nothing of this kind was done; but, as already stated, the husband was permitted to invade the corpus without supervision or restraint. In other words, the trustee did abandon and surrender its own duties in a large measure and remained passive.

Having accepted the trust and undertaken to discharge its duty, it had no power to make such delegation of powers to the husband. (Perry, Trusts [7th ed.], §§ 266, 268, 408; Restatement of the Law of Trusts, vol. 1, § 171.)

It was the duty of the trustee to act in good faith and employ such vigilance, sagacity, diligence and prudence in the management of the trust estate as in general prudent men of discretion and intelligence employ in their own affairs. (*Costello* v. *Costello,* 209 N. Y. 252, 261.) This does not mean delegation of such duties to another. Furthermore, in acting as trustee and as a banking institution, there can be no " divided loyalty." Acting in a fiduciary capacity, its interests were entirely separate from that of the banking institution permitting unlimited overdrafts. Where there is such fiduciary relation and mismanagement is found, the question of good faith and honesty of purpose is unimportant. (*Wendt* v. *Fischer,* 243 N. Y. 439; *Meinhard* v. *Salmon,* 249 id. 458; *Pyle* v. *Pyle,* 137 App. Div. 568; affd., 199 N. Y. 538; *Matter of Flint,* 240 App. Div. 217, 221; affd., 266 N. Y. 607; *Matter of Junkersfeld,* 244 App. Div. 260, 265; *Matter of Balfe,* 245 id. 22, 25; *Matter of Young,* 249 id. 495; affd., 274 N. Y. 543; *Matter of Lyon,* 251 App. Div. 327.)

As to the approval by the son of certain checks, this, of course, would have bound him as remainderman, but it cannot bind those who survived and now may become remaindermen.

Of course, it does not matter greatly what claims a particular remainderman had on the bounty of the settlors of the trust. When the trust agreement was executed and delivered, rights,

absolute or contingent, became vested in interest but not in possession. We do not undertake to determine at this time the ultimate rights of remaindermen whose interests are now contingent or not vested in possession, nor the extent and value thereof. These questions will be presented at the death of the surviving life tenant.

Assuming that the trustee did unlawfully abandon its discretion in respect to expenditures and surrendered it to one of the life tenants, the principle of duty and obligation may become merely an abstract one if, in fact, the proper result was reached — that is, if the amount actually expended for the support and maintenance of the life beneficiaries was not excessive in view of the amount of the property and their ordinary standard of living, and if provision were made for the proper support of the surviving life tenant. The rights of the remaindermen were subordinate to the rights of the life tenants for their support and consisted only of the right to take whatever was left after the death of the life tenants in an estate properly administered according to the terms of the trust. In other words, provisions for the support of the life tenants might properly have exhausted the entire corpus or a substantial part thereof.

The subjects of proper management and of necessary expenditures have been left untouched by the report of the referee and by the decision at Special Term, except by implication in approving the account. The state of the record does not permit us to reach a positive conclusion as to the rights of the parties.

The matter must be remitted to Special Term for further proof and consideration in the respects indicated. We think there should be a supplemental account bringing the transactions of the trustee approximately to the present date; and inquiry should be made concerning the management of the trust, in view of its terms and of all the interests involved.

The commissions to be allowed will depend on the results of this further hearing.

The order in so far as an appeal is taken therefrom should be reversed on the law and the facts, with costs to appellant, payable out of the trust estate, and the matter remitted to Special Term to proceed in accordance with this opinion.

HAGARTY, CARSWELL, ADEL and TAYLOR, JJ., concur.

Order settling the intermediate account of the trustee, so far as an appeal is taken therefrom, reversed on the law and the facts, with costs to appellant, payable out of the trust estate, and matter remitted to Special Term to proceed in accordance with opinion by DAVIS, J.