Murray, Appellant

From Decree of Judge of Probate.

Piscataquis.      Opinion, January 26, 1946.

*Verrill, Dana, Walker, Philbrick & Whitehouse,* for the trustees.

*Effler & Eastman* and *Wayne Strichter,* Toledo, Ohio, *John Powers White,* for remainderman.

*M. O. Locke,* pro se.

SITTING: THAXTER, MANSER, MURCHIE, JJ., CHAPMAN, ACTIVE RETIRED JUSTICE.

MANSER, J.   Charles Locke, by his will, created a trust for the benefit of his wife for her lifetime, with remainder over to Doro-

thea Locke Murray, his daughter by a former marriage. He designated his attorney and a bank as trustees, and they were appointed by the Probate Court. Their first account as trustees covered the period from August 1937 to February 1943. The account is challenged in two particulars by the remainderman. The Judge of Probate overruled the objections, and the account was allowed with certain other modifications which had been agreed to by the parties. A full hearing was held in the Probate Court, and on appeal to the Supreme Court of Probate, the entire record of the Probate Court proceedings was reported to the Law Court "to render such final judgment as the law and facts require to determine all rights of the parties."

The first objection relates to a payment of $3,000, made in July 1939, from the corpus of the estate for the ostensible purpose of providing for the comfortable support and maintenance of the life tenant.

The second objection is to charges against principal of the estate for loss on two bonds purchased at a premium by the trustees. One bond was paid at maturity with a loss from the purchase price of $49.87. The other bond was called at a loss of $32.00. The contention was that the rule should be established that such losses must be taken from income and not charged against principal.

With relation to the first objection, the will made provisions as to use of income as follows: It authorized the trustees to retain reasonable compensation for their services; to pay out of income for the preservation and management of the estate and property, including taxes, and improvement of the property of the estate.

It further authorized and directed the trustees to distribute the net income to the beneficiary at least four times in each year.

Then is found a specific provision that the

"Trustees and successors of them in said trust are hereby authorized and empowered to pay from the principal of my estate such sums as in their absolute discretion may be

needed for the comfortable support and maintenance of my said wife, Edna Mae Oakes Locke."

It is by virtue of this provision that the trustees assert their justification for the payment of $3,000.

The situation was as follows: Mr. Locke, the testator, died in November 1935. He had not been engaged in business since his marriage to the wife who survived him. He received by will a large sum from his mother, and a second considerable sum in securities from a source indefinitely described as a Mr. Smith in Toledo.

In addition to the testamentary trust, Mr. Locke created an irrevocable trust in August 1935, a few months before his death, under which Mrs. Locke was named as beneficiary for her lifetime, and the remainder was then payable to the living grandchildren of the donor. The bank named as one of the testamentary trustees, was appointed as sole trustee of the living trust. The funds turned over to the trustee under this trust were $344,500 United States Treasury Bonds, and over $51,000 in cash. The trust document contained a similar provision to that in the testamentary trust, that the life tenant should be entitled to the net income during her natural life "together with such part of the principal as the trustee in its sole discretion, shall deem necessary from time to time for the comfortable support and maintenance of Edna Mae Locke in a manner suitable for one of her station in life."

The inventory filed by the testamentary trustees included the homestead at Cape Elizabeth, appraised at $25,000, other real estate appraised at $2,000, and securities and cash amounting to $250,718.62.

It, therefore, appears that the two trusts constituted the whole of the settlor's aggregate estate of $672,000. It further appears from the record that these assets constituted the chief source of income for both husband and wife while they lived together, and that the purpose and intention of the husband, so far as his wife was concerned, was to make certain she should have the benefit

of the combined income of both trusts during her life. As beneficiary, she was to have the entire income which both had shared before her husband's death. Consequently, the income from both must be taken into account in determining whether the trustees might properly withdraw from the principal of one. The record shows that the case was tried upon that hypothesis. The bank was trustee of the one, and the bank and the individual trustee were trustees of the other. They both, therefore, had the opportunity of access to the sources of information as to the entire amount of income, and other relevant facts.

The testamentary trustees paid from the income of their trust fund taxes on real estate and property insurance, which averaged about $900 a year, and this went to the benefit of the life tenant, the income actually received by her being in addition thereto. Mrs. Locke received as income from the testamentary trust during the years 1937, 1938 and 1939, $21,774.34, and from the living trust $37,077.19, or a total average for the three-year period of $19,600 annually. In the first six months of 1939 she received $10,000. Mrs. Locke's health was generally good, and she estimated her medical expenses averaged $75 a year, in addition to compensation of a nurse for one period of eight weeks.

In the spring of 1939 she made some substantial renovations upon the homestead, amounting to nearly $3,000. She testified that, after these were completed, she went to the individual trustee early in July of 1939 and "told him that I had to make the repairs and that they were going to cost this amount of money and possibly more, and because of that and other commitments, I would need more money for the year, and I asked him if I was entitled to money out of the principal under the terms of the will and he said he would have to have a written request, which was done in his office at my request." Such request, in the form of a letter, was prepared by the trustee on July 10, 1939, but made no mention of "other commitments." Mrs. Locke received from the trustees check for $3,000 two days thereafter. She testified that the other commitments she mentioned referred to the fact that

she had agreed to purchase her brother's share in their father's estate. She had already paid $550, and subsequent to the receipt of the money from the trustees, disbursed for her brother's account about $1,400 more, making a total of approximately $1,950. This was a capital investment which was thereby diverted from income for her "comfortable support and maintenance." Mrs. Locke testified that she did not communicate to the trustees the fact of this investment.

It also appears that, on January 1, 1938, Mrs. Locke received $3,000 on account of income from the testamentary trust. This particular sum she deposited on a savings account, which she already had in the trustee bank. This deposit remained untouched until December 1939, and was on deposit at the time the $3,000 payment from principal was turned over to her. It appears that she had forgotten or overlooked the fact. It does not appear, however, that either of the trustees requested information as to the nature of the other commitments mentioned by her, made no specific inquiries as to her expenditures for her own comfortable support and maintenance, and did not become aware of the savings deposit of over $3,000 in the trustee bank, or the fact that she also had on checking account a balance of $1,725.

That the gentlemen administering the trust were men of good judgment, of fine character, standing and reputation, is to be taken for granted.

Their counsel assert the following propositions:

1. The trustees are entitled, when a moderate request is made by the beneficiary for payment out of principal, to assume that she is acting in good faith when she says she needs the money.

2. That Mr. Locke was an indulgent husband and would probably have acceded to her request, so the trustees were warranted in doing the same.

3. That they acted in good faith and without dishonest motive.

4. That, *ipso facto*, the payment having been made and their discretion being absolute, it is not within the province of the remainderman or the Court to question it unless it is made to ap-

pear by evidence of the fullest and clearest character that there has been abuse of discretion.

Neither the first nor the second contention presented state the true rule by which trustees in such a situation must be guided. There can be no delegation of discretion to the beneficiary, and the trustees are bound by the instructions of the testator in his will, rather than by an assumption that he would not expect them to be so bound.

The term "discretion" has been defined as deliberate judgment — the discernment of what is right and proper. It implies soundness of judgment — judgment directed by circumspection. These definitions are culled from Words and Phrases, Permanent Edition, Vol. 12.

As said in *Alford* v. *Richardson*, 121 Me., 316, 321, 114 A., 193:

> "The will invests the Trustee with the right to use his discretion, to use his own judgment, in determining whether or not the conditions specified in the will exist or not in fact, and as to how much relief may properly be given. So long as he acts within his power, honestly and in good faith, his determination is conclusive."

Here, the trustees did not use their own discretion. They left the determination to the beneficiary, and thereby surrendered their own discretion to her. They did not use their own judgment. They did not determine whether the conditions specified in the will existed. The trustees did not ascertain the true facts, knowledge of which was chargeable to them. They did not learn that the beneficiary had committed herself to the payment of $1,450 in capital investment in addition to $550 already spent for the purpose. They did not learn that the beneficiary had at the time unexpended income of $4,725. The information was readily accessible.

It is also suggested by counsel that the sum paid was trivial, and represented but little more than one per cent of the principal of that particular trust. Of course, that argument is fallacious.

Moreover, it appears from the record that the following year the beneficiary invested $5,000 in southern property, to which she holds title. Could it be said that she would have been entitled to deplete the principal of the estate by that amount for such a second capital investment because it represented only two per cent of the principal?

The Court must interpose where the trustees fail to use their own judgment because of a mistaken view of their power or duties, whether the mistake is one of law or of fact. Restatement of the Law of Trusts, §187 - h. Scott on Trusts, §187.3; *Garvey* v. *Garvey*, 150 Mass., 185, 22 N. E., 889; *Boyden* v. *Stevens*, 285 Mass., 176, 188 N. E., 741; *Matter of Osborn*, 299 N. Y. Supp., 593; *Matter of Flood*, 217 N. Y. Supp., 702.

> "If a trust is created for beneficiaries in succession, the Trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests." Restatement of Law of Trusts, §232, and note b thereunder; also §183.

As said in *Matter of Osborn*, supra, a trustee who permits a beneficiary to invade the corpus of the estate without supervision or restriction, unlawfully abandons his duties as trustee by so doing. "The question of good faith and honesty of purpose is unimportant."

This is in no wise contrary to the rule laid down by our Court that the exercise of discretion by trustees is not reviewable when the trustees have acted in good faith according to their best judgment and uninfluenced by improper motives. *Wight* v. *Mason*, 134 Me., 52, 180 A., 917; *Kimball* v. *Blanchard*, 101 Me., 383, 64 A., 645; *True Real Estate Co.* v. *True*, 115 Me., 533, 99 A., 627.

Further comment is unnecessary as to the third and fourth contentions made for the trustees. What has already been said has application thereto.

Upon the record as presented, the trustees failed to appreciate their duty under the will to the life tenant and the remainderman, their action was not justified, and the amount charged in

their probate account of $3,000 paid from principal to the widow must be disallowed, together with the charge against principal of five per cent of the sum for their own services in that regard.

The second contention is that when bonds are purchased at a premium, they must be amortized by retaining from income and crediting to principal so much of the premium over the interim period as would constitute a loss to principal when the bonds mature or are called. It is true that when bonds mature, only the face value will be paid, or if called under the the terms of the bond contract, only the call price will be paid. If a higher price is paid for the bonds, then loss results to principal, if there has been no amortization. Technically, such transactions come within the category of wasting investments, thus creating a detriment to the remainderman. In this jurisdiction there is no statutory or judicial rule which arbitrarily governs the situation. The Uniform Principal and Income Act adopted in some states, but not in Maine, permits trustees to purchase at a premium without the requirement of amortization. This might well be called a rule of convenience for the guidance of trustees. In ordinary investment periods, it is possible to buy some good securities at a premium and other good securities at a discount, and the gain or loss practically offset each other without direct application of the rule of amortization.

The reasons for and against amortization of discount or premium on bonds purchased by trustees in instances where there are successive beneficiaries, are fully discussed in Bogert on Trusts and Trustees, §§830, 831, pp. 2423-2434, and in the absence of legislation, it appears there is no fixed rule, and the Court has no occasion in the determination of this case to put its stamp of approval on one method and veto the other. It cannot be said in the present instance that the trustees have acted without proper regard to the rights of all. In certain changes of investments evidently made to procure a larger income, but with due regard to the safety of principal, they were acting within their discretionary rights, without any resulting net loss to principal. The two items

of charges against principal here questioned may be allowed in the probate account of the trustees.

Under the terms of the report of this case, it was agreed by counsel that the Court might indicate what disposition should be made as to counsel fees and expenses. This we leave to the determination of the Judge of Probate.

> *Case returned to the Supreme Court of Probate to be remanded to the Probate Court of Piscataquis County for further proceedings in accordance with this opinion.*