[649 NYS2d 592]

In the Matter of ONBANK & TRUST Co., as Trustee of Discretionary Common Trust Fund "A" (Equities) of ONBANK & TRUST Co., Appellant-Respondent.

In the Matter of ONBANK & TRUST Co., as Trustee of Discretionary Common Trust Fund "B" (Fixed Income) of ONBANK & TRUST Co., Appellant-Respondent. ELIZABETH A. HARTNETT et al., Respondents-Appellants.

Fourth Department, November 8, 1996

## APPEARANCES OF COUNSEL

*Melvin & Melvin,* Syracuse *(Richard Covey* of counsel), and *Carter, Ledyard & Milburn,* New York City, for appellant-respondent.

*Elizabeth A. Hartnett,* Syracuse, guardian ad litem for Trust Fund A income beneficiaries, respondent-appellant.

*Robert L. Jokl, Jr.,* Syracuse, guardian ad litem for Trust Fund A principal beneficiaries, respondent-appellant.

*Peter E. McLellan,* Syracuse, guardian ad litem for Trust Fund B income beneficiaries, respondent-appellant.

*Michael E. O'Connor,* Syracuse, guardian ad litem for Trust Fund B principal beneficiaries, respondent-appellant.

*Dennis C. Vacco, Attorney-General,* Albany *(Michael Nicholson* of counsel), for New York State Banking Department, *amicus curiae.*

*Sullivan & Cromwell,* New York City *(John Warden* of counsel), for New York Clearing House Association, *amicus curiae.*

*Kramer, Levin, Naftalis & Frankel,* New York City *(Marvin E. Frankel, E. Lisk Wyckoff, Jr., Carol A. Ensalaco* and *Ashley A. Roberts* of counsel), and *David L. Glass,* New York City, for New York Bankers Association, *amicus curiae.*

## OPINION OF THE COURT

Boehm, J.

Petitioner, OnBank & Trust Co. (OnBank), appeals from so much of the order of Onondaga County Surrogate's Court (Wells, S.), entered January 18, 1996, requiring OnBank, as trustee of two discretionary common trust funds, to reimburse the trusts for the management fees of mutual funds in which common trust funds were invested and ordering a hearing to determine the amount to be surcharged against OnBank. Respondents, Elizabeth A. Hartnett, Robert L. Jokl, Jr., Peter E. McLellan and Michael E. O'Connor, the four guardians ad litem representing the beneficiaries of the trusts, separately cross-appeal from that part of the same order that determined that OnBank did not violate Banking Law § 100-c (3), 3 NYCRR 22.20 (Regulation 22.20) and the trust funds' own Plans of Operation by investing common trust assets in mutual funds. The New York State Banking Department, the New York Bankers Association and the New York Clearing House Association have appeared as *amici curiae.*

## I

Pursuant to Banking Law § 100-c (6), OnBank commenced these proceedings in Surrogate's Court for the judicial settlement of its accounts as trustee of two common trust funds: Discretionary Common Trust Fund "A" (Equities) and Discretionary Common Trust Fund "B" (Fixed Income). Those ac-

counts cover the period from December 1, 1984 through September 31, 1993.

The funds were established in 1967 as discretionary common trust funds by the former Merchants National Bank & Trust Company of Syracuse, a national bank. On January 1, 1993, it converted its charter and merged with OnBank, a State savings bank, which became OnBank & Trust Company, a State-chartered commercial bank and trust company. During the accounting period, OnBank invested some of the assets of the funds in four mutual funds, each of which is a registered investment company under the Investment Company Act of 1940, as amended (15 USC § 80a-1 *et seq.*). As of December 31, 1993, Fund "A" had a total principal asset value of approximately $13.4 million, with 33 stocks in its portfolio, and Fund "B" had a total value of $16.4 million, with 66 securities in its portfolio. The common trust funds held a total investment of $1,096,436 in mutual funds and during the accounting period its largest holding in mutual funds was approximately $2,000,000. OnBank calculated that the total mutual fund management fees during the accounting period approximated $50,000.

The guardians ad litem appointed by the Surrogate to represent the interests of the principal and income beneficiaries of the funds raised objections to the accounts on the grounds that the investment of common trust fund assets in mutual funds was an improper delegation of management duty and that investment in mutual funds subjected the common trust funds to an additional layer of management fees.

Hearings were held on June 13, 1995 and September 13, 1995, at which OnBank introduced in evidence a State Banking Department letter, dated May 15, 1995, setting forth its opinion that investment of the assets of common trust funds in mutual funds is not an improper delegation of the management of a common trust fund and that a trustee of a common trust fund is not required to absorb the fees charged by mutual funds. In addition, Barbara Kent, an associate attorney in the legal division of the State Banking Department, the author of the letter, testified that investment in mutual funds was an accepted practice in the hundreds of common trust funds in New York and that, in the opinion of the Banking Department, the investment of common trust fund assets in mutual funds violated neither the Banking Law nor the Banking Board regulations established thereunder; therefore, such investment should not subject a trustee to a surcharge for the mutual fund fees. Eugene F. Maloney, Vice-President and Corporate Counsel

of Federated Investors, Inc., sponsor of one of the mutual funds invested in by OnBank, testified that at least 50 bank trust departments in New York invest common trust fund assets in mutual funds sponsored by Federated Investors alone. The guardians submitted expert testimony in support of their objections.

On January 18, 1996, the Surrogate in a decision and order determined that investment in mutual funds by the trustee of a common trust fund does not constitute an improper delegation of its management duties, but that investment in a mutual fund imposes upon the common trust fund an additional layer of management costs, represented by the mutual fund's fees, in violation of the Banking Law, the regulations thereunder and the common trust funds' Plans of Operation. The Surrogate elaborated on his decision by further decision and order, dated March 22, 1996, denying the parties' motions for reargument.

## II

The trustee of the common trust funds was, for the greater part of the accounting period, a national bank organized under the National Bank Act and, as such, was subject to the regulations of the Office of the Comptroller of the Currency (OCC). The parties agree, however, that this case is governed by New York law. The OCC regulations in any event require compliance with State law. Those regulations provide that investment by national banks of common trust fund assets in mutual funds is permitted, provided such investment is permitted for State banks organized under the laws of the State in which the national bank maintains its headquarters, in this case New York (OCC Trust Banking Circular No. 4 [Revised] [Sept. 29, 1976]).

The trust funds here were established as discretionary common trust funds in order to distinguish them from those funds that were required to limit their investments to the so-called "legal list". After New York enacted the "prudent man rule" to govern the investments of fiduciaries (EPTL 11-2.2) and abolished the legal list, Banking Law § 100-c (3) was amended in 1972 to eliminate the distinction between discretionary and legal list common trust funds (L 1972, ch 805, § 1). Under the statutory framework, all common trust fund trustees were authorized to invest trust assets in "such investments as [the trustee] may select in its discretion" (*ibid.; see, Matter of Bank*

*of N. Y. [Spitzer—Koenig],* 43 AD2d 105, 107, *affd* 35 NY2d 512).[1]

Consistent with the language of the statute, courts have applied EPTL 11-2.2 to trustees of common trust funds (*see, Matter of Bank of N. Y. [Spitzer—Koenig], supra,* 35 NY2d, at 518-519; *Matter of Bankers Trust Co. [Siegmund],* 219 AD2d 266, *lv dismissed* 87 NY2d 1055; *Matter of Morgan Guar. Trust Co.,* 89 Misc 2d 1088, 1091).

EPTL 11-2.2 (b) (1) expressly authorizes fiduciaries to invest "in securities of any management type investment company [mutual fund]." This authorization applies if the instrument defining the powers of the fiduciary permits the investment of trust funds, either in (a) "[s]uch investments as the fiduciary may, in his discretion, select" or (b) "investments other than those in which fiduciaries are by law authorized to invest trust funds" (EPTL 11-2.2 [b] [1]).[2]

OnBank's Plans of Operation, the instruments defining OnBank's powers, authorize OnBank to make such investments "as it may select in its discretion." The guardians did not submit evidence of any prohibition against investing in mutual funds in the underlying trust instruments. Nevertheless, the guardians contend that OnBank violated the Plans of Operation by investing common trust funds in mutual funds because the Plans of Operation specifically limit investment to "equity type investments" in Fund "A" and to " 'fixed income' investments" in Fund "B". We see no difference, however, between such investments held as individual securities and the same investments held in mutual funds.

The guardians also argue that, under the Banking Law, OnBank is prohibited from delegating its managerial responsibilities by shifting them to a mutual fund. Banking Law § 100-c (2), as originally enacted, provided that "[e]ach common trust fund shall, subject to law, be under the exclusive management and control of such trust company" (L 1937, ch 687, at 1562). One commentator wrote that such prohibition was "aimed directly at the evils of delegation of managerial functions" (Note, *The Common Trust Fund Statutes—A Legalization of Commingling,* 37 Colum L Rev 1384, 1386 [1937]). The Legisla-

---

1. With respect to investments made on or after January 1, 1995, EPTL 11-2.2 has been superseded by the "Prudent Investor Act" (*see,* EPTL 11-2.3; L 1994, ch 609). All of the investments at issue were made prior to January 1, 1995.

2. The limitations to mutual fund investment in EPTL 11-2.2 (b) were repealed by the Prudent Investor Act as of January 1, 1995 (EPTL 11-2.3 [d]).

ture did no more than codify the common-law prohibition against delegation (*see,* Restatement of Trusts § 171, comment *h,* at 444 [1935]). At common law, a trustee could not delegate duties that involved the exercise of judgment or discretion (*see, Matter of Osborn,* 252 App Div 438, 444).

In 1986, the Legislature amended Banking Law § 100-c and removed the provision in section 100-c (2) addressing the exclusive management of a common trust fund for the reason that it was "superfluous" (Mem of State Dept of Banking, 1986 McKinney's Session Laws of NY, at 2867). Simultaneous with the amendment, however, the Banking Department promulgated Regulation 22.20 (3 NYCRR 22.20), which adopted similar language. That regulation provides, "[a] trust company administering a common trust fund shall have the exclusive management thereof". Further, each of the Plans of Operation requires that OnBank "shall have the exclusive management and control of the Fund," and that the investments of each fund "shall be subject to the joint control of two or more duly authorized officers or employees of the Bank."

Nevertheless, the foregoing restrictions do not prohibit the investment of common trust funds in mutual funds. Such investments always remain subject to the "prudent man" rule of EPTL 11-2.2 and do not alter the trustee's fiduciary responsibilities. EPTL 11-2.2 (b) (1) expressly authorizes fiduciaries to invest in management type investment companies, and the legislative history of EPTL 11-2.2 (b) makes clear that the legislation was intended to clarify that such investment did not come within the common law's prohibition against delegation. As the Surrogate observed, the trustee still maintains the ultimate managerial control of the investment by retaining the paramount authority to buy, hold or sell the shares of a mutual fund investment. This interpretation is consistent with the position taken by the Comptroller of the Currency regarding the investment of common trust fund assets managed by national banks, which are governed by Federal regulations that also require exclusive management by the trustee (*see,* 12 CFR 9.18 [b] [12]).

This is further supported by the Restatement, which points out that "pooled investing [does not] violate rules concerning delegation. Acquisition, retention, and disposition of the trust's interest in the mutual fund or other pooling arrangement are all within the trustee's control" (Restatement [Third] of Trusts § 227, comment *m,* at 51).

Although the mutual fund assumes the responsibility of choosing the individual investments, the trustee maintains

control by choosing a mutual fund that is operated according to investment objectives consistent with those of the underlying trust. Additionally, shares of the mutual fund can be redeemed almost immediately after a request from the shareholder, which also enables the trustee to maintain close control over the investment.

We, therefore, conclude that investment in mutual funds by the trustee of a common trust fund does not constitute an improper delegation of its management authority.[3]

Before dealing with the Surrogate's interpretation of Banking Law § 100-c (3), we would dispose of the argument of *amici curiae* that the Surrogate was inconsistent in not heeding the Banking Department's interpretation of section 100-c (3), yet at the same time adhering to the Banking Department's interpretation of EPTL 11-2.2 (b) (1) and Regulation 22.20. Although the Surrogate's conclusion agreed with the Banking Department's interpretation, as he points out in his decision of March 22, 1996 denying reargument he "did not adopt the Department's reasoning on the delegation issue but rather independently reached the same conclusion." We would avoid the same appearance of logical inconsistency by noting that we, too, have reached the same conclusion independently.

## III

The establishment of common trust funds originated from the recognition that banks were reluctant to administer small trusts because of the economic burdens of doing so (*see,* Clifford, *Commingled Trust Funds,* 11 Harv Bus Rev 253 [1933]; Note, *The Common Trust Fund Statutes—A Legalization of Commingling, op. cit.*). Nevertheless, small trusts were as much in need of professional management as large trusts. Further, under the common law, trustees were not permitted to commingle assets of individual trusts. In response to the problem, New York enacted legislation in 1937 permitting the creation of common trust funds (Banking Law § 100-c). The Legislature recognized that the beneficiaries of smaller trusts would bene-

---

3. Governor Rockefeller, upon approving the predecessor to EPTL 11-2.2 (b) (1) (Personal Property Law § 26 [1]), stated: "The bill is intended to obviate any contention that a fiduciary who invests in securities of management type investment companies registered under the Federal Act improperly delegates his discretionary fiduciary powers" (Messages of Governor: Investments by Fiduciaries in Securities of Investment Companies, 1961 McKinney's Sess Laws of NY, at 2138; *see generally,* Shattuck, *The Legal Propriety of Investment By American Fiduciaries in the Shares of Boston-Type Open-End Investment Trusts,* 25 BU L Rev 1, 12-13, 20 [1945]).

fit from the pooling of the assets of individual trusts provided there was not an additional expense imposed for managing the pooled assets. Accordingly, the law limited trustees to the fees and commissions that they earned in administering each of the underlying trusts, but prohibited the payment of fees or commissions for managing the common trust fund (*see, Matter of Lincoln Rochester Trust Co.,* 201 Misc 1008, 1016). Thus, Banking Law § 100-c (3) provides: "A common trust fund shall not be deemed a separate trust fund on which commissions or other compensation is allowable, and no trust company maintaining such a fund shall make any charge against such fund for the management thereof."

Although section 100-c has been amended numerous times, the last time in 1986, the Legislature left unchanged the language in subdivision (3). When section 100-c was amended in 1986, the Memorandum of the State Department of Banking in support of the bill stated that the changes were made to eliminate features of the statute that "deplete[d] the assets of trusts without providing commensurate benefits to trust beneficiaries" (Mem of State Dept of Banking, *op. cit.*, at 2869). Obviously, the emphasis of the law was to protect the assets of the underlying trusts that composed the common trust fund. That purpose was recognized in the promulgation of Regulation 22.20, which provides: "A trust company administering a common trust fund shall have the exclusive management thereof and shall not charge a fee for the management of the common trust fund, or receive, either from the common trust fund or from any estates, trusts or funds, the funds of which are invested in participations therein, any additional fees, commissions, or compensations of any kind by reason of such participation. The trust company shall not pay a fee, commission, or compensation out of the common trust fund for management." The common trust fund is permitted, however, to reimbursement "for such reasonable expenses incurred by it in the administration thereof." *(Ibid.)*

Such purpose was recognized by OnBank, as well. In its Plans of Operation, it assures the beneficiaries in paragraphs 4.6 of both Plans that "[t]he Bank shall not charge any fee for the management of the Fund, nor shall it receive, either from the Fund or from any Participant, any additional fee, commission or compensation of any kind by reason of such participation. The Bank shall not pay any fee, commission or compensation out of the Fund for the management thereof."

No one disputes that the mutual funds charge a fee for the management of the assets under their control. Indeed, the fee

is disclosed in the prospectus of each of the funds annexed as exhibits to the parties' Agreed Statement of Facts. But OnBank's characterization of the mutual fund's management or advisory fee as being only a part of the investment, similar to the internal management costs of publicly traded companies, does not withstand scrutiny, nor does the attempt at comparison of a mutual fund share to a share in General Motors. Ownership of a share of General Motors carries with it attributes of ownership that do not exist with a share in a mutual fund, i.e., the right to vote for directors, to participate in certain corporate decisions, and the conferring of standing necessary to bring a derivative action against corporate management. Further, the ownership of a corporate share of stock is not burdened with an annual management fee.

Consistent with the broad purpose of the statute, the language of Regulation 22.20 prohibits not only the charging of a fee by the trustee but also that the trustee not "pay a fee, commission, or compensation out of the common trust fund for management." Thus, the underlying trusts are protected, not only from having to pay a double fee to the trustee, but also from having a fee imposed for a third party's services that fall within the scope of the trustee's management duties.

OnBank contends, however, that the advisory or management fee is not a fee for the management of the trust fund because it is a fee paid by the mutual fund itself for services rendered by the investment advisor to the mutual fund. The fee, it argues, is unrelated to the management of the common trust fund and should be considered an expense of investing chargeable against the common trust fund in the same way that it would be chargeable to an underlying trust if it invested in a mutual fund directly, rather than through the common trust fund. In support, OnBank has offered the opinion of the State Banking Department and the testimony of Barbara Kent, to both of which, OnBank contends, the court should defer.

As a general rule, the construction given statutes and regulations by the agency responsible for their administration should be given great weight and judicial deference where the construction is not irrational, unreasonable or inconsistent with the governing statute (*Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d 166, 173). The general rules regarding agency deference have been delineated as follows: "(1) where the statute employs technical terms within the agency's expertise * * * (2) where the general statutory language and legislative history indicate the Legislature

intended to adopt a broad policy approach to the subject matter of the statute, delegating to the administrative agency comprehensive * * * authority, interstitially to 'fill in the blanks' consistently with the over-all policy of the statute * * * (3) where the agency participated in the legislative activity leading to the authorizing legislation and the agency's interpretation of the statute is contemporaneous with enactment * * * and (4) where the agency's interpretation has been long standing and unchallenged, inducing reliance thereon by those practicing before it" (*Matter of Judd v Constantine*, 153 AD2d 270, 272-273).

In addition, deference to an agency's construction of a statute is warranted where the construction of " 'a statute or its application involves knowledge and understanding of underlying operational practices' " (*Matter of New York State Assn. of Life Underwriters v New York State Banking Dept.*, 83 NY2d 353, 360; *see, Matter of Lezette v Board of Educ.*, 35 NY2d 272, 281).

However, where "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency" (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459; *see, Matter of Yong-Myun Rho v Ambach*, 74 NY2d 318, 321; *Galbreath-Ruffin Corp. v 40th & 3rd Corp.*, 19 NY2d 354, 365-366, *rearg denied* 19 NY2d 973). Further, there is a real difference between regulatory agencies interpreting specialized language having an uncommon meaning and regulatory agencies attempting to make broad-based policy determinations. No deference is due them with respect to the latter (*see, Boreali v Axelrod*, 71 NY2d 1, 9).

None of the principles that would ordinarily require deference to agency interpretation is applicable here. The question presented is one of pure statutory reading and analysis of the legislative intent. The Banking Department's interpretation of the statute was not contemporaneous with the enactment of section 100-c (3) and the only interpretation that has been long standing and unchallenged is that contained in its memorandum of May 21, 1984, where it construed Banking Law § 100-c (3) and EPTL 11-2.2 (b) (1) as permitting the investment in mutual funds by a common trust fund with or without specific provision therefor in a Plan of Operation. Trustees may be said to have relied upon that long-standing interpretation, but it may not be said that there was similar reliance upon the Bank-

ing Department's interpretation of Banking Law § 100-c (3) and Regulation 22.20 regarding fees taken by mutual fund managers. Such interpretation was offered for the first time in the May 15, 1995 letter of Barbara Kent in response to the request of counsel for OnBank with respect to this proceeding.

Further, the language of the statute and of the regulations is not ambiguous; the words are clear and comprehensible and do not require a special knowledge of the practices of fiduciaries or of the banking industry. The issue is whether a particular cost is an "expense" or a "management fee" and over the past 40 years courts have had no problem making that distinction (*see, Matter of Chase Natl. Bank,* 206 Misc 343; *In re Chase Nat. Bank,* 116 NYS2d 141; *Matter of Lincoln Rochester Trust Co.,* 201 Misc 1008, *supra; Matter of Bank of N. Y.,* 189 Misc 459). Thus, in *Matter of Lincoln Rochester Trust Co. (supra),* the compensation of auditors for the annual audit of a common trust fund was held to be part of management costs that could not be paid out of the assets of a common trust fund, and this prohibition was incorporated in Regulation 22.20. The cost for printing a Plan of Operation, however, has been held to be an expense, rather than a management fee, and chargeable against the common trust fund (*Matter of Chase Natl. Bank, supra,* 206 Misc, at 344).

Even if the statute were considered to be ambiguous, the Department's interpretation would be contrary to the statute's purpose. The Department's conclusion that mutual fund investment advisor fees may be charged against the common trust fund would appear to be based on two arguments. The first is that the statute was intended only to prevent the trustee from "double dipping", that is, receiving two fees, one from the underlying trust and the other from the common trust fund. That interpretation is flawed. The regulations and OnBank's own Plans of Operation prohibit not only double dipping, but also the payment of a charge to anyone else for management. Thus, the obvious purpose is to protect the trust fiduciaries by not depleting their trust funds by the payment of more than one fee, regardless to whom it may be paid. The second argument is that the fee imposed by an investment company manager is an expense to the common trust fund, rather than a fee. However, the Department has neglected to give any basis for this conclusion and, in our view, it misconstrues the nature of the charge imposed by the mutual fund. The mutual fund management fee is not an acquisition cost or expense related to maintenance of the assets; rather, it is a charge incurred to

obtain the benefit of the investment expertise of the manager or investment advisor of the mutual fund. The Investment Company Act defines an "investment adviser" as any person who pursuant to contract with the investment company regularly furnishes advice to the company "with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by [the investment] company" (15 USC § 80a-2 [a] [20] [A]).

The significance of the mutual fund arrangement is that it permits the trustee to outline its broad investment goals and leaves the details of choosing the appropriate investments to the mutual fund investment advisor. This responsibility, if performed by OnBank, would be classified as a managerial one, rather than as an administrative one, and one for which it could not make a charge against the common trust fund. Similarly, it may not pay a fee to anyone else for this managerial responsibility. There is no difference between a financial manager of a mutual fund and a financial manager who operates independently and charges a fee for his or her investment services. Barbara Kent, who testified on behalf of OnBank, conceded that, if a mutual fund billed OnBank directly for such management services, OnBank could not charge that fee against the common trust fund.

OnBank is compensated by the underlying trusts for management, and such management would ordinarily include the selection of investments. By investing in a mutual fund, OnBank relieves its Trust Department of the task of researching and choosing particular investments, but does not reduce the commission it collects from the individual trusts. At the same time, there is charged a fee against those assets of the common trust fund that are invested in the mutual fund for the service provided by the mutual fund's investment advisor. The result is that there are multiple layers of investment management costs. The technical argument made by OnBank that the Banking Law only prohibits OnBank from itself paying the fee fails to recognize that what may not be done directly may not be done indirectly; otherwise, the protective purpose of the statute is undermined. Regardless of who "pays" the fee or "makes" the charge, the existing arrangement permits OnBank to shift the cost of investment selection back to the common trust fund.

There are obvious benefits that may be derived from investing in mutual funds. Those benefits are freely available to both

the underlying trusts and the common trust fund. The difference is that the common trust funds are subject to the protection of the Banking Law and its regulations; that protection prevents the trustees of a common trust fund from paying or permitting the payment of a fee, whether to itself or to the investment advisor of a mutual fund. Any such fee must be absorbed by the trustee. If a change is sought, then such change must come from the Legislature.[4]

Accordingly, the order should be affirmed.

PINE, J. P. (dissenting in part). I respectfully dissent and vote to modify the order to vacate the determination that management fees charged by mutual funds in which assets of petitioner's common trust funds are invested must be absorbed by Onbank. I disagree that permitting those fees to be paid from the assets of the common trust fund constitutes a violation of Banking Law § 100-c (3). Fiduciaries in New York are permitted to invest in mutual funds (EPTL 11-2.2 [b] [1]). In limited circumstances where the fiduciary or its affiliate provides certain services to the mutual fund, the fiduciary must choose between receiving compensation for the service to the mutual fund or receipt of trustee's commissions (EPTL 11-2.2 [b] [1]). Trust companies in New York are permitted to establish common trust funds (Banking Law § 100-c). Thus, common trust funds in New York may invest in mutual funds. Both are mechanisms for diversification of investments especially beneficial to small estates.

Reading Banking Law § 100-c (3) and EPTL 11-2.2 (b) (1) together leads me to the conclusion that the purpose of both is to prohibit a trust company from being paid twice to manage the same money. While both common trust funds and mutual funds are useful devices of special benefit to small estates, a trust company obviously should not have an economic incentive to add layers of management fees to estates for which it is responsible, an incentive that would be present if it could receive additional compensation for administering an estate as part of a common trust fund or for investing an estate in a mutual fund from which it received additional fees.

The result of the majority's interpretation of these statutes is that if a trust company invested an estate directly in an unrelated mutual fund it would not be required to absorb management fees of the mutual fund, but if an estate managed as part

---

4. We are informed by the guardians in their reply brief that a bill to such effect was recently introduced in the New York Legislature.

of a common trust fund were invested in unrelated mutual funds the trust company would be required to absorb the management fees of the mutual fund. Obviously, the usefulness of the authority to invest common trust funds in mutual funds is essentially destroyed.

This reasoning is buttressed by further analysis of EPTL 11-2.2 (b) (1). How would this section be applied if the trust company had both a common trust fund and a mutual fund to which it provided services, and assets of the common trust fund were invested in that mutual fund? The inconsistency between the consequences under EPTL 11-2.2 (b) (1) and the consequences under the majority's interpretation of Banking Law § 100-c (3) persuades me to reject the majority's interpretation.

I find 3 NYCRR 22.20, and its interpretation by the Banking Department, to be within its authority under Banking Law § 100-c (10). That interpretation accords with long-standing practice, is in harmony with language in both the Banking Law and EPTL and is in keeping with the underlying policy of permitting diversification of small estates. We should defer to that interpretation.

CALLAHAN and DOERR, JJ., concur with BOEHM, J.; PINE, J. P., dissents in part and votes to modify in a separate opinion in which LAWTON, J., concurs.

Order affirmed, without costs.